233 F.2d 556
 56-1 USTC P 9452, 56-2 USTC P 9647
 UNITED STATES of America, Appellee,
v.
Henry W. GRUNEWALD, Daniel A. Bolich and Max Halperin,
Appellants, and Max Steinberg, Harry T. Scherm,
Milton Hoffman, Irving Davis and Samuel
Schopick, Defendants.
 No. 95, Docket 23604.
 United States Court of Appeals Second Circuit.
 Argued Nov. 15 and 16, 1955.
Decided April 10, 1956.
Rehearing Denied June 1, 1956.
 
 Corbin, Bennett & Delehanty, New York City (Harold H. Corbin and Edward J. Bennett, New York City, of counsel), for appellant Grunewald.
 Frank Aranow and Rudolph Stand, New York City (Frank Aranow and Rudolph Stand, of counsel), for appellant Bolich.
 Henry G. Singer, Brooklyn, N.Y. (Henry G. Singer and Harry Silver, Brooklyn, N.Y., of counsel), for appellant Halperin.
 Paul W. Williams, U.S. Atty., for Southern District of New York, New York City (Howard A. Heffron and Miriam R. Goldman, Asst. U.S. Attys., New York City, of counsel), for appellee.
 Before FRANK, MEDINA and HINCKS, Circuit Judges.
 MEDINA, Circuit Judge.
 
 
 1
 The case involves the activities of a tax-fixing ring in Washington and New York generally, and especially in connection with the taxpayers Pattullo Modes, Gotham Beef Company and at least one other. The indictment was filed on October 25, 1954, against appellants Henry W. Grunewald, Daniel A. Bolich and Max Halperin and others: in Count 1 all defendants are charged with conspiracy to defraud the United States in the exercise of its governmental functions of administering the internal revenue laws and of detecting and prosecuting violations of the internal revenue laws free from improper influence, dishonesty, fraud and corruption, and in the right and interest of the government in the conscientious, honest and faithful services, judgments, determinations, and actions of the defendants who were members of the Bureau of Internal Revenue, and to conceal the acts of the conspirators, in violation of the general conspiracy statute, 18 U.S.C. § 371; in Count 2 substantially the same charge is made against Bolich, Steinberg and Scherm, as employees of the Bureau of Internal Revenue, in violation of 26 U.S.C. § 4047(e)(4); and in Counts 5, 6 and 7 appellant Halperin is charged with having corruptly endeavored to influence witnesses before the Grand Jury in the Eastern District of New York to give false testimony concerning certain of the transactions involved in the tax-fixing scheme alleged in Count 1, in violation of 18 U.S.C. § 1503 and § 1505. The general, continuing conspiracy is alleged to have been in operation from January 1, 1946 to the return date of the indictment; and the activities of Halperin, charged in Counts 5, 6 and 7, are alleged to have taken place in March, 1952. Counts 3 and 4 were dismissed and are not involved on this appeal.
 
 
 2
 Steinberg and Scherm were acquitted; the appellants were found guilty as charged. Grunewald was sentenced to five years imprisonment and $10,000 fine on the conspiracy charge; Bolich was sentenced to five years imprisonment and $10,000 fine on the general conspiracy charge and to three years imprisonment and $5,000 fine on the charge of conspiring while an employee of the Bureau of Internal Revenue, the prison sentences to run concurrently; and Halperin was sentenced to five years imprisonment and $5,000 fine on the conspiracy charge and two years imprisonment and $1,000 fine on each of the three charges of corruptly endeavoring to influence witnesses, the prison sentences to run concurrently. Halperin testified in his own defense; the others did not.
 
 
 3
 Each of the appellants contends that the evidence is not sufficient to support a finding that he was a party to the conspiracy as charged; that the charge of conspiracy to conceal, coupled with the fact that overt acts were alleged to have taken place in 1951 and 1952, constituted a mere device to avoid the running of the Statute of Limitations which is said to be a bar to prosecution of the conspiracy charges; and that each of the appellants was deprived of a fair trial by reason of numerous allegedly erroneous rulings.
 
 Sufficiency of Proof
 
 4
 The proof of the existence of a single, over-all conspiracy is simply overwhelming. The complicity of Halperin, as well as Davis, Hoffman and others, is established beyond peradventure of a doubt. The evidence is no less convincing against Grunewald and Bolich, and the jury were warranted in drawing the conclusion that all the circumstances taken together established beyond reasonable doubt that Grunewald and Bolich were not only members of the conspiracy, but that they were 'the fixers.'
 
 
 5
 The first reference in the proofs to the Pattullo Modes case is to a time in 1947. Bolich was then Special Agent in charge of the Intelligence Unit of the Bureau of Internal Revenue in New York City. In the fall of 1948, he became Assistant Commissioner of Internal Revenue, with his office in Washington and his living quarters in part of a suite, in the Hotel Washington, maintained as an office by Grunewald and at his expense. The intimacy between Bolich and Grunewald during the time of the events relevant to this case is amply proved. Scherm was a Civil Audit Agent in New York and Steinberg was his superior. These two play a minor role.
 
 
 6
 Schopick, Davis and Hoffman were named as defendants and as co-conspirators, but the case as to them was severed. The first two, partners in the law firm of Schopick & Davis, were not adverse to letting it get around that they could do a good job in income tax fraud cases, irrespective of the merits. Hoffman was employed by them as a business chaser, receiving a split of the fees on the business brought in by him. Occupying office space with the firm, was appellant Halperin, who happened to be an old friend of Grunewald. Schwaeber & Saver, another law firm, was brought into the Pattullo Modes case by Schopick & Davis under circumstances which will again be briefly referred to, and they played an innocent but nonetheless effective role in the operation of the conspiracy.
 
 
 7
 Pattullo Modes was a New York dress manufacturing concern controlled by family stockholders. From 1942 through 1946 Pattullo Modes had defrauded the government of corporate and individual income and other taxes by the simple expedient of making off-the-record sales and 'jacking up the travel and entertainment accounts,' putting the cash proceeds of over $300,000 in a safe deposit box.
 
 
 8
 Louis M. Berman and his brother as partners were the owners of Gotham Beef Co., ship chandlers. Monroe Tobias, associated with H. Merdinger & Co., was the Gotham Beef Co. accountant. Gotham Beef Co. had failed to report income from sales of meat at above ceiling prices on their partnership and individual income tax returns, claiming that this income was offset by unreported purchases at over ceiling prices. The off-the-record sales were in the neighborhood of $100,000, and the documentary proof of the cash premium payments over the ceiling prices amounted to only between 10 and 20 per cent of the over ceiling sales.
 
 
 9
 In the spring of 1947 Scherm who had been making an audit of Pattullo Modes told Smith, the Pattullo Modes accountant, that an examination of a customer of Pattullo Modes had revealed that 'there were certain sales or certain income that was missing' and that a Form 917 disclosing such information was out against them. The effect of this on the Pattullo Modes' people need not be described. It was in June, 1947, that the Gotham Beef Co. case reached a critical stage.
 
 
 10
 The sordid details of how both cases found their way to the law offices of Schopick & Davis were related at the trial. The upshot of the testimony of the taxpayers and of Davis and Hoffman, all of whom turned state's evidence, was that, after a number of preliminary moves to obtain assurances of no criminal prosecution had proved futile, Davis told Halperin that they needed some 'real help.' Halperin suggested that such help might be obtained from Grunewald in Washington, an old friend of his and, far more important, 'a close personal friend' of Bolich, the Agent in Charge in New York. In due course Pattullo Modes produced $100,000 in cash and Gotham Beef Co. produced $60,000 in cash, for 'the man in Washington,' to be paid over to him when the assurances of no criminal prosecution were officially given.
 
 
 11
 Another case, that of 'the Glovers,' comes in only incidentally because it ended in an impasse over price. Davis testified that Halperin told him that Grunewald wanted 'something in the neighborhood of $175,000 or $200,000,' and that he and his associates withdrew from the case when 'the Glovers' said $100,000 was as high as they would go.
 
 
 12
 There is abundant and convincing evidence of how the taxpayers raised the huge amounts of cash said to have been demanded by Grunewald, without disposing of assets, cashing checks or leaving other traces of their having done so; of the details of counting the money and putting it in various safe deposit boxes with safeguards that delivery to Grunewald should not be made until official announcement was made that there would be no criminal prosecution of the taxpayers. There was no direct proof that any part of these sums reached the hands of Bolich; nor did any witness testify to the delivery of either sum to Grunewald. However, in October, 1948, after the Gotham Beef case was closed out 'on a no prosecution basis,' Tobias called Greenstein, co-escrowee with Halperin, and told him he could release the money to Halperin. A few days later Greenstein told Tobias that he had done so; and Halperin informed Davis that he had taken the money to Washington and delivered it to Grunewald. Hoffman testified that, after the official decision not to prosecute Pattullo Modes was made, he went with Halperin to Halperin's safe deposit box in the Chemical Bank and Trust Company. Together they counted the $100,000, placed it in two brief cases, and took it by train to Washington, where Grunewald met them at the Union Station. Halperin, carrying the two brief cases containing the money, and Grunewald walked off together.
 
 
 13
 Grunewald's status as a co-conspirator is established by direct evidence. Hoffman testified that, on one of his trips to Washington with Halperin, he went up to the suite in the Washington Hotel, remaining in the living room where he was joined later by Grunewald and Halperin, who introduced him to Grunewald. Davis further testified that in late September or October of 1948 there was a conversation between Halperin, Grunewald and Davis, in Brunewald's office in the Munsey Building, to the effect that Grunewald had agreed to accept $100,000 in the Pattullo Modes' case, that he, Davis, thanked Grunewald for this, to which Grunewald replied 'O.K., O.K.'
 
 
 14
 Grunewald is reported to have discussed the Gotham Beef case with Halperin in the early summer of 1948 at the Hotel Washington, at which time Grunewald, identifying himself as 'Captain Henry,' telephoned an order to 'put a red flag * * * on the Gotham Beef case.' There was testimony both by Bolich's secretary and by Grunewald's secretary that Bolich received repeated telephone calls from 'Captain Henry' and that, when calling Bolich, Grunewald was identified only as 'Captain Henry.'
 
 
 15
 In March of 1948, and long before Grunewald's connection with the Pattullo Modes case, Bolich as Agent in Charge in New York flatly rejected a perjurious voluntary disclosure claim submitted by Davis. But no sooner had Grunewald agreed to look into the Pattullo Modes case than we find Bolich in New York asking the Special Agent assigned to that investigation for a status report. When it was learned in July, 1948, that the investigators were about to circularize the firm's customers, as a result of the issuance of the Form 917, Davis asked Halperin to see Grunewald; and, shortly thereafter, Bolich issued an order that the field examination be terminated at once.
 
 
 16
 Indeed, it was Bolich who, without the knowledge of the men working in the Pattullo Modes case in the Bureau of Internal Revenue, gave the investigation the coup de grace by agreeing that if the taxpayer cooperated there would be no criminal prosecution. This proved a veritable open sesame and there was a scramble on the part of the Pattullo Modes' people to make every possible scrap of evidence of their wrongdoing promptly available to the government investigators, even to the extent of signing detailed confessions. No wonder the honest men in the Bureau, who had been anticipating a criminal prosecution, were taken aback by such surprising developments.
 
 
 17
 Even in the much less open-and-shut case of Gotham Beef Co., Mullenbach, the government agent, had made a final report in April, 1948, recommending that the individuals involved be criminally prosecuted. The case was assigned to Kuehl, the Assistant Special Adviser in Intelligence Division in New York who had arranged with Ronayne, the taxpayer's attorney, for a conference on August 3, 1948. At this stage, his own efforts to see Bolich having proved unavailing, Davis had Halperin telephone Grunewald who said that Bolich would see Davis. Thereafter Davis conferred with Bolich and Bolich passed the Gotham Beef Co. contentions along to Kuehl. Huehl, after contentions along to Kuehl. Kuehl, after the attorney of record, decided the case was too weak for prosecution. Kuehl also testified that although Bolich had been his superior for three years prior to this, he had never previously received any communication from him, by telephone or otherwise.
 
 
 18
 The malefactors slipped seriously when Bolich received in November, 1949, the report of his former subordinate, Joseph R. Baradel, head of the Conference and Review Section in the Special Agent's office in New York. Baradel was the man who reluctantly announced to the Pattullo Modes' people on January 10, 1949, that, in view of Bolich's commitment, there would be no criminal prosecution of the taxpayers. It having occurred to Baradel that some explanation of Bolich's commitment was called for in the file, he sent the report to Bolich with a little scratch pad note reading 'Any comments? JRB.' Bolich then telephoned Baradel at his home and asked him to write an explanatory memorandum 'to take a little heat off the situation,' which Bolich said 'left him on a hot spot.' Certain changes were made but the substance remained.
 
 
 19
 Many of the important details have been omitted for the sake of brevity and others, bearing on concealment, will be sketched below where they have special relevancy. But even thus abbreviated, the foregoing outline summary of the evidence taken in the course of a seven weeks' trial refutes the contention of appellants Grunewald and Bolich that the record is insufficient to establish their membership in any unlawful conspiracy.
 
 
 20
 Much of the evidence was admitted 'subject to connection.' Grunewald protests that this worked an injustice as to him because it gave a 'fatal aura' to the case, the inevitable effect of which was so to condition the minds of the jurors that they were incapable of viewing the facts in true perspective. Grunewald concedes, however, that such qualified admission is common practice, as indeed he must. 1 Wigmore, Evidence 14 (3rd ed.). This is not to deny the possibility of a case in which it is so abused as to demand reversal, but this is not such a case. Indeed, there was an abundance of direct proof of statements and conduct of Grunewald and, against this background, the protestations of innocence made by his counsel are far from convincing.
 
 
 21
 Neither accountant nor lawyer, but the intimate of such highly placed persons as Assistant Commissioner of Internal Revenue Bolich, Grunewald successfully demanded $100,000 as the price of his participation in the Pattullo Modes matter. His suggestion that this might be due to a philosophy of 'ask and ye shall receive' could persuade only a person of rare naivete. And while 'fixing' broken chairs, windows and so forth is commonly understood to mean restoring the objects to good condition, this is not the common understanding of 'fix' when used, as by Grunewald, in conversation with his secretary, Nancy Hain, with reference to tax cases. Thus the jury could reasonably have understood 'fix' in this context to mean 'to dispose in one's favor by bribery or similar means; to procure the favor of; as, to fix a jury.' Funk and Wagnall's New Standard Dictionary of the English Language, p. 933, col. 2 (1946). On the basis of this and other evidence against Grunewald the jury's finding of his membership in a criminal conspiracy cannot be said to be unwarranted.
 
 
 22
 Appellant Bolich summarizes the case against him as amounting only to proof of his 'friendly acquaintanceship with Grunewald.' He claims that there was nothing unlawful about any of the steps taken by him as an officer of the government charged with the administration of the Internal Revenue Laws. And he relies upon the presumption of innocence and the oft-repeated statement that in a case of circumstantial evidence 'the facts must exclude every other reasonable theory or hypothesis except that of guilt.' What this boils down to, however, is a contention that, as the jury might have found that the association of Bolich and Grunewald was merely one of friendship, and that the relationship between his various rulings, conversations and telephone calls, and the acts of the other participants in the conspiracy, was purely coincidental and wholly innocent, therefore the question of his guilt or innocence should not have been submitted to the jury. But this confusion of the functions of judge and jury merely befogs the issue. It was for the jury to draw the inferences to be deduced from the proofs taken as a whole, after they had, in accordance with the instructions of the trial judge, determined questions of credibility, culled the wheat from the chaff, and reached a conclusion as to what the facts were. In this connection the usual instructions on the presumption of innocence and the rules applicable to circumstantial evidence are given to aid the jury in its deliberations. And see, Holland v. United States, 348 U.S. 121, 139-140, 75 S.Ct. 127, 99 L.Ed. 150. If the law were as contended by appellant Bolich, the court would be required to assume that of conflicting possible inferences those favorable to a defendant must be taken as matter of law; and thus the conviction of the ring leaders and real brains behind illegal conspiracies of the most vicious and harmful character would become impossible, as they often have a front of apparent respectability and keep well concealed their contacts with those who do their bidding and who are more likely to be discovered. United States v. Valenti, 2 Cir., 134 F.2d 362.
 
 
 23
 The function of the trial judge and that of this court is to examine the record and decide whether or not there was sufficient evidence to justify a finding that appellants, including Bolich, were participants in the conspiracy. It is not our function to decide questions of credibility or to choose between conflicting possible inferences, whether taken piecemeal or otherwise. On the record as a whole it is clear to us that the question of the guilt or innocence of Bolich was for the jury.
 
 
 24
 What we have just said applies with equal force to the rules to be followed in appraising the sufficiency of the evidence against Halperin with respect to Counts 5, 6 and 7, which will be discussed more fully below.
 
 Statute of Limitations
 
 25
 Each of appellants argues that, even if a conspiracy is proved, prosecution is barred by the Statute of Limitations. This is an interesting and important question, seemingly one of first impression. As all parties agree that the three-year period prescribed by 18 U.S.C. § 3282 is applicable, the crucial date is October 25, 1951. Bolich, Grunewald and Halperin earnestly press their view that the Statute of Limitations began to run no later than January 10, 1949, when the official ruling was made that there would be no criminal prosecution in the Pattullo Modes case.
 
 
 26
 The instructions of the trial judge on the subject were:
 
 
 27
 'To determine whether certain of the alleged overt acts were in furtherance of the object of the conspiracy, you have to determine the duration of the conspiracy. Did it end when the Pattullo Modes people and the Gotham Beef people received an assurance of no prosecution from the Bureau of Internal Revenue, or was a part of the conspiracy a continuing agreement to conceal the acts done pursuant thereto? In determining whether a part of the conspiracy was an agreement to continue to conceal the illegal acts after their consummation, you may not imply that such an agreement was part of the conspiracy. You would have to find from the evidence of the acts and declarations of the co-conspirators that there was an understanding or agreement to conceal the conspiracy. If you find that such an agreement or understanding to conceal the conspiracy was not a part of the conspiracy to defraud the government, but no more than an afterthought brought to the surface when the co-conspirators were confronted with the Grand Jury and King Committee investigations, then you must find, as a matter of law, that the defendants are not guilty of the crime charged in the first count of the indictment. If you find that the evidence shows, beyond a reasonable doubt, that as a part of a conspiracy to defraud the government, there was an agreement or understanding to conceal the illegal acts and that this too was an objective or part of the conspiracy, then you may find that such understanding was a part of the conspiracy. However, you must additionally determine whether this objective of the conspiracy was known to the defendants. If this objective was known originally by only part of the conspirators but thereafter during the existence of the conspiracy, the scope of the conspiracy was extended so as to include such an agreement to conceal, and if you find that some of the defendants did not know of the expansion to include the agreement to conceal, you may not impute to them the knowledge of their co-conspirators and they could not be found guilty of the crime charged in Count One.'
 
 
 28
 The overt acts relied upon were alleged to have taken place in 1951 and 1952, within the three-year period thus referred to. Accordingly, if there was insufficient evidence to support the above quoted portion of the judge's charge, we must reverse.
 
 
 29
 That there was ample evidence of a single, continuing conspiracy by members of a tax-fixing ring is, we think, too plain for reasonable debate. United States v. Ganey, 2 Cir., 187 F.2d 541; United States v. Manton, 2 Cir., 107 F.2d 834; United States v. Witt, 2 Cir., 215 F.2d 580; United States v. Johnson, 3 Cir., 165 F.2d 42. The partners in the law firm of Schopick & Davis, with their business chaser Hoffman and their associate Halperin, were operating regularly with Grunewald and Bolich, and the specialty of this combination of wrongdoers was fixing tax cases. There is no evidence whatever that the ring ceased operations, nor that any of the appellants withdrew from the conspiracy. The unsuccessful attempt to get the Glover case was made in 1950; and there was evidence that in the post-1951 period appellants maintained a continuing relationship and communication, partly under cover of an alias, and that Grunewald had more than once made statements to the effect that he was in the business of handling tax cases and 'would get them fixed.' Moreover, there was a considerable quantum of evidence of statements and acts, both before and after the refusal of 'the Glovers' to meet the terms suggested by the conspirators, which tended to show that one of the terms of the conspiracy was that the participants would take whatever steps were necessary to cover up their tracks and prevent disclosure of their activities.
 
 
 30
 It must be borne in mind that what these tax fixers did was carried on under the very noses of some of the most experienced and intelligent investigators in the government service. What the fixers had to sell was freedom from criminal prosecution for tax frauds. What the taxpayers bargained for was protection from a tax evasion prosecution.
 
 
 31
 The various steps taken by Bolich were necessarily reflected in numerous official reports of others in the Internal Revenue Bureau. It required no unusual acumen to appreciate the fact that the possibility, indeed the likelihood of an investigation of some sort hung over the conspirators like a sword of Damocles. Indeed, the preliminary steps at avoidance of detection were proved to have been taken while the Pattullo Modes and Gotham Beef cases were being processed. The telephone call to Baradel at his home is one instance. Another is the insistence, at Grunewald's suggestion, that the law firm of Schwaeber & Saver be continued as lawyers for Pattullo Modes and made to believe that the happy outcome, which was the result of the 'fix,' was due to their honest efforts in behalf of their client. This could have served no other purpose than that of forestalling suspicion.
 
 
 32
 This conspiracy is wholly unlike the ordinary illegal scheme in that the jury may well have inferred that the official announcement that there would be no criminal prosecution of the taxpayers was merely the delivery of a substantial installment of what appellants agreed to deliver for the huge sums paid. The six-year Statute of Limitations, 26 U.S.C. (1940 Ed.) § 3748, did not run in favor of the taxpayers until some time after the commission of the overt acts relied upon. In the interval there was no assurance, other than continuing efforts by Grunewald, Bolich and the others, that the whole nefarious business might not be brought to light, followed by the revocation of the decision not to criminally prosecute the taxpayers. This is a significant element in the proofs adduced by the government, as concealment of the conspiratorial acts was necessary not only to protect the conspirators from a conspiracy prosecution but also to protect the taxpayers from a tax evasion prosecution. And the indictment in paragraph 1 specifically charges that the conspirators agreed upon a scheme to defraud the United States in the exercise of its governmental functions of '* * * prosecuting violations of the internal revenue laws.'
 
 
 33
 The civil audit of the books and accounts continued for a long period of time and the conspirators, including the taxpayers, knew this would be so. This was another factor which the jury might consider in determining the scope of the general conspiracy charged.
 
 
 34
 The record contains ample proof of efforts by the conspirators to forestall suspicion and wipe out traces of their operations and these efforts developed later and in 1951 and 1952 into an intensified campaign of concealment, the details of which will be referred to briefly in connection with the charges against Halperin in Counts 5, 6 and 7.
 
 
 35
 Appellants lean heavily upon Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 and Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 919; but these cases, properly construed, support the contentions of the government. In Krulewitch the conspiracy was definitely over when the alleged concealment took place. The contention which the court rejected was that conspirators must be deemed to have agreed 'to collaborate with each other to conceal facts in order to prevent detection, conviction and punishment' and that this was a sort of implied 'subsidiary phase of the conspiracy.' Indeed, no such 'subsidiary' agreement was even alleged in the indictment. In the case before us now it was charged in the indictment that one of the terms of the illegal agreement was that continuing efforts would be made 'to avoid detection and prosecution by any governmental body' and much of the proof adduced at the trial was admitted in support of this charge. The jury were instructed that no such term of the agreement could be implied but that they must make a finding based upon the evidence before them, and that if the efforts to conceal were 'no more than an afterthought' they must find defendants not guilty.
 
 
 36
 In Lutwak, despite the fact that the indictment charged an agreement to conceal, there was no evidence to support it. The clear implication is that, if the allegation had been supported by evidence, the court would have arrived at a different conclusion, for it is stated in the opinion, 344 U.S. at page 616, 73 S.Ct. at page 488: 'But there is no statement in the indictment of a single overt act of concealment that was committed after December 5, 1947, and no substantial evidence of any. Such acts as were set forth and proved were acts that revealed and did not conceal the fraud.' Here the record is replete with evidence of acts of concealment.
 
 
 37
 It is argued that the charge is absurd, as no one could have known in 1948 and 1949 that there would be a congressional investigation in 1951 and a grand jury inquiry in 1952. But these appellants must have known from the outset that the success of their enterprise was in real danger at all times, especially while the files of the taxpayers remained open, cf. United States v. Kissel, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168; Fiswick v. United States, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196, and that any suspicious entry or report found by one of the men in the government intelligence service might touch off an investigation. It was not necessary that the conspirators should know in advance precisely what contingencies would arise, in order to agree as to how they would deal with all possible contingencies which appeared likely to have the results which the conspirators sought to avoid. Cf. United States v. Perlstein, 3 Cir., 126 F.2d 789, certiorari denied 316 U.S. 678, 62 S.Ct. 1106, 86 L.Ed. 1752; United States v. Siebricht, 2 Cir., 59 F.2d 976.
 
 
 38
 Admission on Redirect of Prior Consistent Statements by Davis
 
 
 39
 Another error urged in common by the three appellants relates to testimony by Davis on his redirect examination that in March of 1952 he had told his attorney the facts concerning the $100,000 and $60,000 payments to Grunewald and had authorized his attorney to communicate the statement hypothetically to the United States Attorney.
 
 
 40
 The cross-examination of Davis had covered a wide field. Perhaps the most effective impeachment had to do with his indictment in April 1954 for tax evasion based upon an alleged failure to report $160,000 as taxable income in 1948 and 1949. This exposed a motive to fabricate his testimony concerning the payments to Grunewald, as a means of shielding himself from conviction of a tax fraud in connection with these same moneys. It was also brought out that he had pleaded guilty to an indictment for conspiracy, was awaiting sentence and was hopeful that he would receive consideration for his cooperation with the government and for his testimony. Much was made of the conspiracy plea also, on the theory that Davis might have entered such a plea to avoid automatic disbarment under New York law. And finally, the tax evasion feature was made more probable when he admitted that in 1953 his wife had sued him claiming that he held $125,000 in cash as a joint tenant with her. As no indictments had been found against Davis in 1952 and the suit by his wife had not yet been brought, the testimony of his statement to his attorney, to which objection was made, was proffered and received on the theory that the jury might find that it was made at a time when the motive to falsify did not exist, and give it such weight as it might be entitled to receive on the question of his credibility.
 
 
 41
 The argument is made that this was no more than an attempt by Davis to make some sort of a bargain with the government in 1952 and that his motive to falsify was no less operative at that time than on the trial. But this is mere contention, appropriate enough in summation to a jury, but insufficient to form a basis for the rejection of the testimony as matter of law. Otherwise, it would never be proper to rehabilitate a witness by proof of prior consistent statements in cases where numerous impeaching circumstances were shown to exist at the time of the trial but where there may be found a theoretical possibility that the witness might have been motivated by one of them at the time of making the prior consistent statement. It is well established law in this circuit that in such cases the prior consistent statements may be received. Di Carlo v. United States, 2 Cir., 6 F.2d 364; Gelbin v. New York, N.H. & H.R. Co., 2 Cir., 62 F.2d 500.
 
 
 42
 It is theoretically possible that in 1952 Davis might have seen breakers ahead and felt it in his interest to sound out the government reaction to his hypothetical statement. But it is scarcely probable that he foresaw his wife's suit for her alleged share of $125,000 in cash or his own indictment for tax evasion of $160,000, or the effect on his possible disbarment of a plea to an indictment which had not yet been found against him.
 
 
 43
 The principle involved is that where the circumstances are such as to leave it reasonably possible for the jury to say that the prior consistent statements did in fact antedate the motive disclosed on the cross-examination, the court should not exclude them. Di Carlo v. United States, supra. Here we think there was ample basis for such a finding.
 
 
 44
 On the oral argument particular stress was laid upon the fact that Davis' lawyer was only authorized to repeat the statement hypothetically. We were told that this differs widely from a prior statement of fact to the same effect as his testimony given on direct examination. But we need not pass on this as the statement made to his attorney was not hypothetical in form but a plain statement of actual fact. This was admissible, nor does it become any the less so because the authority to repeat it was confined to mere hypothesis.
 
 Bolich's Appeal
 
 45
 Bolich's appeal raises certain additional questions which do not affect the other two appellants. The first of these is whether the acts alleged and proved constituted two offenses, as charged, or one, as the appellant contends. The point was raised at the trial by motion to compel an election, which was denied.
 
 
 46
 The government, in support of the conviction, argues that proof of official employment, an element of the crime charged in Count 2, is not an element of that charged in Count 1. Both statutes under which Bolich was indicted, tried, and convicted make it a crime to 'conspire * * * to defraud the United States.' One of these statutes, 18 U.S.C. § 371, applies to all persons; the other, 26 U.S.C. § 4047(e)(4), applies specifically to 'every officer or agent appointed and acting under the authority of any revenue law of the United States * * *.' This question has been considered by the Supreme Court in Albrecht v. United States, 273 U.S. 1, 47 S.Ct. 250, 71 L.Ed. 505 and again in Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306. In both cases the test applied to determine whether the defendant was being subjected to double punishment was 'whether each provision requires proof of an additional fact which the other does not.' Blockburger v. United States, supra, 284 U.S. at page 304, 52 S.Ct. at page 182. In the case at bar, it is true, as the government contends, that proof of a violation of 371 of Title 18 of U.S.C., charged in Count 1, will not prove a violation of § 4047(e)(4) of Title 26 of U.S.C., charged in Count 2, which requires proof of the additional fact of official employment. But it is no less true that guilt under Count 2 of necessity means that guilt under Count 1 has been proved, and, consequently, the test laid down by the Supreme Court has not been met.
 
 
 47
 The function of this test, however, is not to create a harmonious body of penal law, desirable though that is, but to protect defendants from being punished twice for having committed a single crime. Hence the rule is that a defendant may not be heard to complain because he has been convicted and sentenced to prison under two separate statutes for having committed a single offense, if the prison terms are to run concurrently. Hirabayashi v. United States, 320 U.S. 81, 85, 63 S.Ct. 1375, 87 L.Ed. 1774; Brooks v. United States, 267 U.S. 432, 441, 45 S.Ct. 345, 69 L.Ed. 699. Since the prison terms to which Bolich has been sentenced are to run concurrently, they may stand. This does not completely answer the double punishment argument, however, because Bolich was also fined under both statutes. On the foregoing reasoning, only one of these may be permitted to stand, and the question now becomes which one.
 
 
 48
 In this situation, the problem of which statute governs can sometimes be resolved by reference to legislative intent. For example, Congress having enacted legislation dealing specifically with atomic espionage after careful weighing of relevant considerations may conceivably be thought to have intended its new pronouncement to supersede, to the extent of overlap, its previous, more general enactment relating to espionage. See Note, 54 Col.L.Rev. 219, 252 (1954).
 
 
 49
 This approach is not feasible in the instant case because here the specific provision antedates the general one and imposes the lighter sanction of the two. It may be that persons who have undertaken the trust and responsibility of enforcing a particular law should not because of that undertaking be subjected to a severer punishment for an infraction of that law than any one of the public at large who is, of course, under a duty to obey the laws of the land. But surely no justification or reason can be found for treating the infraction of the public official more leniently than an otherwise identical infraction by a non-official. Moreover, any invocation of legislative intent can only be the grossest sort of fiction where, as here, we have no legislative history to guide us.
 
 
 50
 There is then no rational basis for determining that one of the two statutes in question applies to the defendant's conduct and the other does not. Both are undoubtedly valid and subsisting. All that we can and do determine is that both statutes can not validly apply in so far as their application operates to produce cumulative punishment. Since both fines, therefore, cannot stand, the smaller of the two is set aside.
 
 
 51
 Bolich's brief makes two other points, one relating to evidence and the other to the instructions to the jury, neither of which has any merit and which may, therefore, be disposed of briefly. The testimony of both Everett Harding and Daniel Olsen, relating respectively to hotel records of charges to Bolich and to carpentry work done in Bolich's home, was properly admitted since the testimony of these witnesses, together with the other proofs referred to supra, tended to support the allegation that a continuing agreement to conceal was part of the single, integrated conspiracy entered into by appellants and their co-conspirators.
 
 
 52
 The court was correct in charging that the propriety of the decisions not to prosecute the taxpayers criminally were not in issue. United States v. Manton, 2 Cir., 107 F.2d 834, 845-846. Nor was it error to instruct the jury that they might, if they chose, believe the testimony of the co-conspirators or accomplices. Bosselman v. United States, 2 Cir., 239 F. 82; United States v. Rosenberg, 2 Cir., 195 F.2d 583, certiorari denied Sobell v. United States, 344 U.S. 838, 73 S.Ct. 21, 97 L.Ed. 652. The charge upheld in the Rosenberg case, supra, also contained the statement-- to which appellants here take particular exception-- that without such testimony many cases could not be proved. If perhaps this last was unnecessary, it was certainly not prejudicial error, for we can find no basis for the supposition that the jury might have interpreted it as a limitation on their freedom to reject the testimony in the instant case if they thought it unworthy of belief nor, indeed, as anything but the statement of fact that it is.
 
 Halperin's Appeal
 
 53
 On cross-examination, the prosecutor was permitted to ask Halperin, over his objection, whether he had invoked his constitutional privilege against self incrimination before the Grand Jury in response to the same or similar questions in response to which he had testified fully on the trial. Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054, resolved the issue thus raised in favor of permitting such questioning and we have nothing to add to what has already been written on the subject by this court in United States v. Gottfried, 2 Cir., 165 F.2d 360, 367, and note 18, and the cases there cited.
 
 
 54
 As a corollary to the plea for reversal because of the cross-examination on the subject of Halperin's assertion of his constitutional privilege against self incrimination before the Grand Jury, counsel for Halperin contends that it was serious and clearly prejudicial error for the trial judge to refuse to instruct the jury that 'an innocent man may honestly claim that his answers may tend to incriminate him.'
 
 
 55
 There is no doubt that this statement is true enough standing by itself; and counsel claim that it has a peculiar relevancy here, because Halperin in his testimony at the trial denied any guilty conduct whatever. When he refused to answer certain questions propounded to him before the Grand Jury, he told the Grand Jurors that he was innocent of any wrongdoing, and explained at one time that he did so because he had no right to cross-examine witnesses before the Grand Jury, and later that he had been advised by his counsel to refuse to answer questions. Against this background, we are told, it was the duty of the trial court, when requested to do so, to explain to the jury that 'an innocent man may honestly claim that his answers may tend to incriminate him.'
 
 
 56
 But a scrutiny of the instructions to the jury, when considered as a whole, makes it perfectly plain that the argument is based not upon the substance of Halperin's rights, but upon the colorful and appealing phraseology of the request as submitted. And this is more or less of a commonplace occurrence, especially in criminal cases, where emotional appeals and a certain amount of old-fashioned oratory are legitimate. There is necessarily a wide range of discretion vested in the trial judge, who must clearly and accurately state the rules of law by which the jury is to be guided in its deliberations, whilst at the same time avoiding confusion and the distraction of matters likely to lead the jury away from the issues they are called upon to decide. Quotations from law books and from the opinions of appellate courts frequently cause a certain amount of confusion and distraction, despite their accuracy in the context in which they are written. Accordingly, it is well settled that it is not error to refuse to instruct in the language submitted by counsel, if the charge correctly states the law applicable to the case. Sugarman v. United States, 249 U.S. 182, 185, 39 S.Ct. 191, 63 L.Ed. 550; United States v. International Fur Workers Union, 2 Cir., 100 F.2d 541, 546, certiorari denied 306 U.S. 653, 59 S.Ct. 642, 83 L.Ed. 1051.
 
 
 57
 What the trial judge was called upon to do under the circumstances of this case was to instruct the jury that Halperin had a right to refuse to answer the questions propounded to him before the Grand Jury, that his having done so could not be considered as any proof of guilt of the crimes charged against him, and that such evidence had been received and was to be considered by the jury only for the purpose of ascertaining the weight the jury chose to give to his testimony in his own defense at the trial. And this is precisely what the trial judge did, in clear and unmistakable terms.[1] The request to charge as submitted added nothing to this, and was properly denied. Moreover, Halperin was in no way restricted or circumscribed in his explanation, given on his redirect examination, of why he had previously claimed his privilege.
 
 Counts 5, 6 and 7
 
 58
 From the time in June, 1950, when 'the Glovers' refused to accede to Grunewald's 'fee' of $175,000 to $200,000 the conspirators were in constant touch with one another. In September, 1950, Bolich employed a carpenter to construct a hiding place in his home for secret Washington papers. In December, 1951, when the Sub-Committee of the House Ways and Means Committee, known as the King Committee, subpoenaed the Washington Hotel records, which would show Bolich's occupancy with Grunewald, under the name of Harry Woodring, Bolich falsely denied to Harding, the hotel manager, that he had ever taken those records. Halperin made repeated trips to Washington to see Grunewald during 1950, 1951 and 1952; and time and again from 1948 through 1952 Halperin refused to divulge Grunewald's name to any of the taxpayers or their accountants.
 
 
 59
 For a time, despite prolonged questioning of the taxpayers and various members of the conspiracy it looked as though a combination of equivocation and silence might succeed in covering up the operations of the conspirators. But the break came when an inadvertent statement by Mrs. Marjorie Segel, one of the Pattullo Modes stockholders, led to the discovery of the false affidavit by their accountant Smith, which had been submitted in support of the voluntary disclosure claim. This led to Smith's arrest on August 30, 1951.
 
 
 60
 In February, 1952, a Grand Jury was empaneled in Brooklyn to investigate violations of the Internal Revenue Laws and their administration and enforcement. We need not pursue the details as the investigators followed the scent.
 
 
 61
 Count 5 of the indictment charges Halperin with having, on March 15, 1952, aided and abetted Davis, Hoffman and Schopick in corruptly endeavoring to induce Morton Marks, another of the Pattullo Modes stockholders, to give false testimony or to withhold the truth from the Brooklyn Grand Jury. Counts 6 and 7 make similar charges against Halperin with reference to attempts on March 15 and March 18, 1952, to induce Louis M. Berman and Monroe Tobias, connected with Gotham Beef Co., to falsify or withhold information from the same Grand Jury.
 
 
 62
 Halperin claims that the evidence is insufficient to sustain the verdict against him on each of Counts 5, 6 and 7.
 
 
 63
 In the early part of March, 1952, the Pattullo Modes taxpayers consulted new counsel and, after some difficulty, Davis succeeded in obtaining an interview with Morton Marks, who was about to testify before the Grand Jury. The conversation was:
 
 
 64
 'Davis: Morton, what are you going to do? * * * Are you going to talk?
 
 
 65
 'Marks: I am going to do what my counsel advises us.
 
 
 66
 'Davis: Well, you can't talk. You would be crazy to talk. * * * Morton, are you going to turn me in?'
 
 
 67
 Davis gives a slightly different version and fixes the date at about March 8, or 9 or thereabouts.
 
 
 68
 This was a plain obstruction of the Grand Jury proceedings and an improper tampering with the witness. And there is sufficient connection with Halperin to justify his conviction under Count 2.
 
 
 69
 Davis testified to a prior conversation in February, 1952, at which Halperin, Schopick and Hoffman were present, where the subject of the testimony of the taxpayers before the Grand Jury came up. The substance of the talk was, 'All of us felt that the clients would not talk and would plead their constitutional privilege.'
 
 
 70
 The conversation apparently relied upon by the prosecution, which can only be understood in the light of what had previously taken place, was in March and immediately prior to the visit of Davis to Marks, as above described. With the same persons present Davis testified that he reported to the others that he felt that the taxpayers 'were going their own way, their separate ways,' and 'they (Halperin, Hoffman and Schopick) said that I should nevertheless try to communicate with Mr. Marks.'In the welter of corruption with which this record is replete, we think the jury was justified in drawing the inference that what Davis did when he saw Marks was precisely what Halperin and the others intended him to do, when they all agreed that Davis should try to see Marks.
 
 
 71
 The evidence adduced in support of Counts 6 and 7 describes attempts by Halperin himself to influence both Berman and Tobias. The substance of what Halperin said to both is reflected in the testimony of Berman that Halperin told him 'he felt he was going to stand on his constitutional rights and not do any talking. He wanted me to take the same stand, that I should not talk and stand on my constitutional rights. He mentioned the fact that he had done me a good turn and that was the least I could do for him.'
 
 
 72
 It is immaterial that Halperin did not ask these witnesses to tell deliberate falsehoods. The whole tenor of the conversations, which took place after the Pattullo Modes taxpayers had talked freely with government investigators, was that of impeding justice and maintaining secrecy with respect to the operations of the conspirators. Moreover, it is nothing short of fantastic to suggest that this is no more than legitimate advice by a lawyer to a client, for the client's own protection.
 
 
 73
 As there was ample proof that Halperin knew these witnesses were expected to testify before the Grand Jury the trial judge correctly charged the jury that tampering with potential witnesses was within the meaning of the statute, which makes it a crime to 'corruptly * * * (endeavor) to influence, intimidate, or impede any witness, in any court of the United States * * *.' 18 U.S.C. § 1503.
 
 
 74
 It is now and has long been established that the law protects the integrity of the entire judicial process, of grand jury proceedings, as well as trials. Davey v. United States, 7 Cir., 208 F. 237, certiorari denied231 U.S. 747, 34 S.Ct. 320, 58 L.Ed. 464. The connotation of 'witness' is similarly determined with a view to substance, rather than form and hence any one who 'knows or is supposed to know material facts, and is expected to testify to them, or be called on to testify * * * is a witness.' Odom v. United States, 5 Cir., 116 F.2d 996, 998, reversed on other grounds 313 U.S. 544, 61 S.Ct. 957, 85 L.Ed. 1511; Walker v. United States, 8 Cir., 93 F.2d 792.
 
 
 75
 Accordingly, the convictions of Halperin under Counts 5, 6 and 7 must stand.
 
 
 76
 We have also considered the claim of variance and miscellaneous other points raised by the several appellants with respect to allegedly erroneous rulings. There is no merit in any of these contentions and we think it unnecessary to discuss them.
 
 
 77
 Affirmed except as to the $5,000 fine against Bolich.
 
 
 78
 FRANK, Circuit Judge, dissenting (solely as to the defendant Halperin).
 
 
 79
 Except as to Halperin, I concur. I would grant him a new trial. His plight presents a most important problem of principle relative to the constitutional privilege against compelling an accused person to be a witness against himself. I disagree with my colleagues' solution of that problem.
 
 
 80
 Before a grand jury,[1] Halperin had refused to answer questions, on the basis of his anti-self-incrimination privilege. No one doubts that he then properly asserted the privilege. At his subsequent trial, he took the stand and, on direct examination, answered the same or similar questions put to him by his lawyer. The prosecutor, on cross-examination, then asked Halperin whether, at the grand jury hearing, he had not refused to reply to such questions. Over Halperin's objections, the trial judge required Halperin to admit that he had. Later the trial judge instructed the jury that that refusal before the grand jury must not be considered as proof of his guilt, but that the jury might properly consider it as affecting the credibility of his other testimony at the trial. Judge Medina's opinion-- citing Raffel v. United States, 1926, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054, and decisions of this court based on Raffel-- holds that the trial judge did not err in over-ruling those objections and in giving this charge. I cannot agree.
 
 
 81
 At first glance, Raffel may seem to sustain my colleagues' ruling. But I disagree with that ruling, because I think (1) Raffel was wrong and that the Supreme Court has over-ruled it, (2) Raffel does not apply to the facts here, and (3) in any event, the very recent trend of Supreme Court decisions concerning the privilege requires our court no longer to follow Raffel.
 
 
 82
 1. In Raffel, on a first trial, a government agent testified to an admission by the accused, who relying on his privilege, did not offer himself as a witness. The jury did not reach a verdict. On a second trial, the government agent gave similar testimony. The accused now took the stand and denied making the admission. Over objection, he was compelled to testify that, on advice of counsel, he had not testified at the first trial. The Supreme Court held this was not error, despite the statute (now 18 U.S.C.A. § 3481) which provides that an accused, at his own request, may be a witness at his trial but that 'his failure to make such a request shall not create any presumption against him.' The Court said that Raffel's previous silence constituted some evidence of inconsistency with his denial, at the second trial, of the admission to the agent, and therefore bore on the credibility of that denial. The Court concluded that to require Raffel to tell the jury of his silence at the first trial did not violate his privilege against self-incrimination, since, by electing to testify at the second trial, he completely waived the privilege.[2]
 
 
 83
 In 1926, soon after the Raffel decision, Hinton, a noted and sagacious commentator, severely criticized it as follows:[3] 'It may be easy enough as a matter of theory to distinguish between the prohibited use of the defendant's former silence as an implied admission to prove guilt and the negative use of the same fact for the sole purpose of discrediting his testimony, but is it possible to make it work in practice? In the case of a mere witness it is undoubtedly permissible to cross-examine as to any inconsistency between his present testimony and his former statements or conduct. His former silence may discredit his present testimony, and it is assumed that a jury can be made to understand that reasons for doubting or refusing to credit his testimony are not to be taken as proof of a contrary state of fact, just as prior contradictory statements may be used to discredit without violating the hearsay rule. In such a case the prior statement is not received to prove the truth of the facts therein asserted, but merely to detract from the credit of the later statement. But where the defendant is the witness such a refinement seems impracticable, if not impossible. In the ordinary case where a defendant has made express or implied admissions and later testifies, such admissions may be used both to prove his guilt and to disprove his testimony, and hence no difficulty arises. The jury are entitled to make all logical uses of the evidence. In the actual case (i.e. Raffel's case) the silence of the defendant at the first trial must be taken as an implied admission of the truth of the adverse testimony, otherwise there would be no inconsistency with his present testimony and no discredit. But the federal statute, which certainly applied when he failed to testify, clearly prohibits its use to sustain the charge. It is doubtful whether a trained judge could actually make a purely negative use of such an implied admission. If he thought the inconsistency sufficient to refuse credit to the testimony, it is unlikely that he could avoid being influenced by it in his final conclusion. Certainly it is inconceivable that the average untrained jury could successfully perform such a feat of mental gymnastics. If it is practically impossible to limit the effect of the evidence, then it would seem that the policy of the statute ought to exclude it altogether.'
 
 
 84
 Hinton's analysis may be restated thus: (a) Impeachment of a witness' testimony by proof of an earlier statement is justified only where there is 'self-contradiction,' 'a real inconsistency' between that earlier statement and that testimony. 3 Wigmore, Evidence, Section 1040. (b) An earlier inconsistent statement may be implied, i.e. derived from the witness' earlier silence: His 'failure to assert a fact when it would have been natural to assert it, amounts, in effect, to an assertion of the non-existence of the fact.' 3 Wigmore, Section 1042. (c) The earlier silence of the accused may, then, properly be used to impeach his sworn statement, at the trial, of his innocence, only if the earlier silence amounted to an implied admission of his guilt. (d) But the Fifth Amendment and the federal statute (now 18 U.S.C. § 3481) forbid the proof of such silence, as inferred evidence of guilt, when that silence rested on the exercise of the constitutional privilege.
 
 
 85
 Hinton was surely correct in saying that a jury will not be able to heed the judge's cautionary charge that such evidence must be given effect solely in its bearing on the credibility of the accused. Like many other sorts of cautionary instructions, it asks the jury to do the well-nigh impossible. In Nash v. United States, 2 Cir., 54 F.2d 1006, 1007, Judge Learned Hand wrote of 'the recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else'; in United States v. Gottfried, 2 Cir., 165 F.2d 360, 367, he said, 'nobody can indeed fail to doubt whether the caution is effective * * *'; see also his remarks in United States v. Delli Paoli, 2 Cir., 229 F.2d 319. In United States v. Antonelli Fireworks Co., 2 Cir., 155 F.2d 631, 656, dissenting opinion, it was noted that a cautionary instruction may emphasize the very matter the jury is told to forget, 'as in the story, by Mark Twain, of the boy told to stand in a corner and not think of a white elephant.' Mr. Justice Jackson, concurring in Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790, observed: 'The naive assumption that prejudicial effects can be overcome by instructions to the jury * * *, all practicing lawyers know to be unmitigated fiction.' It 'is well enough,' said Wigmore (8 Wigmore, p. 416), 'to contrive artificial fictions for use by lawyers, but to attempt to enlist the layman in the process of nullifying his own reasoning powers is merely futile, and tends towards confusion and disrespect for the law's reasonableness.' In United States v. Paoli, supra, Judge Hand referred to such an instruction as a 'placebo.' Fletcher, Morals and Medicine (1952) 51-52, calls a 'placebo' or 'bread pill' a 'medicinal lie' which undermines 'a truly moral relationship between physician and patient'; it 'encourages the idea * * * that drugs will cure most ailments and this serves to extend the patent-medicine evil.' Similarly, such a cautionary instruction is a kind of 'judicial lie': It undermines a moral relationship between the courts, the jurors, and the public; like any other judicial deception, it damages the decent judicial administration of justice.
 
 
 86
 Hinton's criticism of Raffel, made in 1926, has even greater pertinence today. For in recent years the public, from which jurors are drawn, has 'been told in every headline, on the authority of prominent legislators, that silence (based on the constitutional privilege) means guilt';[4] in Emspak v. United States, 349 U.S. 190, 75 S.Ct. 687, 690, 99 L.Ed. 997, the Court noted that 'in these times a stigma may somehow result from a witness' reliance on the Self-Incrimination Clause * * *.' Several state courts have disagreed sharply with the reasoning on which Raffel rests and with its conclusion, see e.g., State v. Conway, 348 Mo. 580, 585-589, 154 S.W.2d 128.
 
 
 87
 2. In 1943, some seventeen years after Raffel, the Supreme Court, in deciding Johnson v. United States, 318 U.S. 189, 63 S.Ct. 549, 553, 87 L.Ed. 704, pretty obviously took cognizance of the criticisms levelled at Raffel. In Johnson, the defendant, indicted for wilful evasion of payment of income taxes for the years 1936 and 1937, at his trial testified on his own behalf. When the prosecutor, on cross-examination, asked a question about defendant's income, from illegal sources, in 1938, the defendant asserted his Constitutional privilege; the trial judge ruled that defendant need not answer that particular question, and defendant then refused to do so. The prosecutor, in his summation, commented on this refusal to answer concerning the 1938 income as showing the falsity of defendant's testimony about his 1936 and 1937 income. The trial judge charged the jury that defendant's refusal to answer the particular question concerning 1938, 'may only be considered by you in testing his credibility.' The Supreme Court said that, although the attempted inquiry as to 1938 called for evidence which was undeniably relevant, yet it was error for the prosecutor or the trial judge to refer to defendant's refusal to answer the question, even for the limited purpose of impeaching his credibility. The Court said: 'The ruling of the court gave the petitioner the choice between testifying and refusing to testify as to his 1938 income. An accused having the assurance of the court that his claim of privilege would be granted might well be entrapped if his assertion of the privilege could then be used against him. His real choice might then be quite different from his apparent one. In this case it would lie between protection against an indictment for 1938 and the use of his claim of privilege as evidence that he did in fact receive the income during the last two months of 1937. Elementary fairness requires that an accused should not be misled on that score. If advised by the court that his claim of privilege though granted would be employed against him, he well might never claim it. If he receives assurance that it will be granted if claimed, or if it is claimed and granted outright, he has every right to expect that the ruling is made in good faith and that the rule against comment will be observed. * * * The problem here is * * * whether a procedure will be approved which deprives an accused on facts such as these of an intelligent choice between claiming or waiving his privilege. Knowledge that a failure to testify though permitted by the court would be submitted to a jury might seriously affect that choice. If the accused makes the choice without that knowledge, he may well be misled on one of the most important decisions in his defense.'[5]
 
 
 88
 In so ruling, the Supreme Court, in effect, I think, overruled Raffel. The sole difference between the Raffel and Johnson cases is this: In Raffel, the privilege had been successfully asserted in a previous trial; in Johnson, the successful assertion of the privilege occurred in the same trial. This difference seems to me so impalpable that we cannot reasonably say, I think, that the Johnson case kept the Raffel decision alive. Significantly, the government in its brief in the instant case does not refer to the Johnson case, although defendant had made much of it in his brief.
 
 
 89
 3. In United States v. Klinger, 2 Cir., 136 F.2d 677, this court held the Johnson case rationale inapplicable to facts like those here; and it is true that Halperin's case, like Klinger's, differs from both Johnson and Raffel in this respect: Halperin (like Klinger) asserted his privilege not at a previous trial or at the same trial but pre-trial, i.e. before indictment, in the grand jury's presence. However, the rationale of the Johnson decision becomes stronger, not weaker, in such circumstances. For a man in a grand jury hearing may have far better reasons for preserving silence: There he is not confronted with the adverse witnesses, has no opportunity to cross-examine them, cannot object to the reception of evidence which would be incompetent at a trial,[6] is unable to call witnesses on his behalf, has no counsel to advise him, must submit to a secret and ex parte examination 'without the presence and control of a judge or any other impartial official, to * * * intervene * * * to protect' him.[7] As Judge Learned Hand said in 1953, 'Save for torture, it would be hard to find a more effective tool of tyranny than (this) power of unlimited and unchecked ex parte examination.'[8]
 
 
 90
 Accordingly, even apart from the effect of the Johnson case, the Raffel doctrine is inapposite here: In Raffel, the defendant at his first trial had the same opportunity as at his second trial to confront and cross-examine the adverse witnesses, to be assisted by counsel, to object to incompetent evidence, to summon witnesses on his behalf, etc., etc. Nor should we forget that the constitutional privilege had its English origin in protests against questioning persons, ex parte and in secret, before they had been formally charged with any crime.[9] It is noteworthy that the Supreme Court has never applied the Raffel doctrine to a case where the previous exercise of the privilege occurred in a grand jury hearing.
 
 
 91
 If it be urged that the foregoing lacks significance here because Halperin is himself a lawyer, the short answer is the wise old adage that a lawyer who acts for himself has a fool for a client. Moreover, Halperin, on redirect, explained as follows why he had availed himself of the privilege in the Grand Jury hearing: Schopick, Davis and Hoffman had told him they intended to 'make a deal for immunity' and would then testify at the Grand Jury hearing that he was implicated; they threatened that, if he testified otherwise, they would see that he was indicted for perjury. On advice of his lawyer, he relied on his privilege because of these threats, and because before the grand jury, he was not represented by counsel, and also would have no opportunity to cross-examine those who had threatened him in order to show they were lying.
 
 
 92
 By requiring Halperin to tell the jury that he had previously exercised his privilege, the trial judge put him in a predicament where he was virtually compelled to give such an explanation, since, if unexplained, it would count heavily against him. It will not do, then, to say that his opportunity to give the jury such an explanation cured the error. On the contrary, the need to explain served to illuminate the error; for the consequence of the error was that, in effect, the propriety of the previous exercise of his privilege turned on the jury's belief in his explanation. No one who legitimately exercises the constitutional privilege ought to be so placed that he must subsequently justify it to a jury.
 
 
 93
 In Klinger, 2 Cir., 136 F.2d 677, this court reasoned thus: (1) In Johnson, the Supreme Court said that it would be error to receive evidence of the defendant's assertion of his privilege at the same trial, unless the trial judge, when ruling that the defendant could remain silent in answer to a particular question, warned him that his silence could be used to impeach his credibility. (2) But, said this court, it would be irrational to require such a specific warning to a man asserting the privilege in a grand jury inquiry, since a witness before a grand jury need not even be warned that he has the anti-self-incrimination privilege.[10] A sufficient answer is that, in Johnson, the Supreme Court did not rule that the defendant must be warned that his successful assertion of the privilege might be used against him, but that, absent such a specific warning, the exercise of the privilege could not later be used against him. So, in the instant case, the vice is that, absent such a warning at the time when he exercised his privilege at the grand jury hearing, the defendant was compelled at the trial to testify that he had thus previously exercised it.
 
 
 94
 Were this an ordinary civil case, involving no constitutional issue, I would, although disagreeing with them, feel constrained to follow our fairly recent Klinger decision, and our subsequent decision in United States v. Gottfried, 2 Cir., 165 F.2d 360, 367-- which cited and relied on Klinger-- as binding precedents in this circuit. But-- for reasons I have stated in detail in United States v. Scully, 2 Cir., 225 F.2d 113, 118-119-- I do not feel similarly constrained by our circuit's precedents, favorable to the government, in a criminal case, when I think them unjust or unreasonable.[11] Consequently, I would not here follow Klinger or Gottfried.
 
 
 95
 4. Even if I thought the Supreme Court had not in Johnson over-ruled Raffel, and even if I thought Raffel applied here, nevertheless I would disregard Raffel. For as this court has heretofore said, an inferior court like ours should follow, not resist, a new pronounced doctrinal trend in Supreme Court decisions when considering the precedential force of older Supreme Court decisions. See Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 217-218; Judge Learned Hand in Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632, 636; Judge Parker in Barnette v. West Virginia State Board of Education, D.C., 47 F.Supp. 251, 252-253.
 
 
 96
 When the Supreme Court decided Raffel, that Court, some other courts, and many commentators-- following Bentham who decried all the privileges against testifying-- were manifesting a marked hostility to the constitutional privilege and were severely modifying its scope. See, e.g., A.L.I. Model Code of Evidence (1942) p. 130; 12 Cornell L.Q. (1927) 216; United States v. St. Pierre, 2 Cir., 132 F.2d 837, at page 847, 147 A.L.R. 240, dissenting opinion. But on May 23, 1955, the Supreme Court far more generously construed the pertinent part of the Fifth Amendment. See Quinn v. United States, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964; Emspak v. United States, 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997; Bart v. United States, 349 U.S. 219, 75 S.Ct. 712, 99 L.Ed. 1016. In Quinn (349 U.S. 155, 75 S.Ct. 673), the Court said that the privilege, incorporated in the federal Bill of Rights in 1791, was as the Court had said in Twining v. State of New Jersey, 211 U.S. 78, 91, 29 S.Ct. 14, 53 L.Ed. 97 "generally regarded then, as now, as a privilege of great value, a protection to the innocent though a shelter to the guilty, and a safeguard against heedless, unfounded, or tyrannical prosecutions." The Court added, 'to apply the privilege narrowly or begrudgingly-- to treat it as an historical relic, at most merely to be tolerated-- is to ignore its development and purpose.' In Emspak (349 U.S. 190, 75 S.Ct. 690) the court, referring to the 'Self-Incrimination Clause,' spoke of the 'great right which the Clause was intended to secure * * *.'[12]
 
 
 97
 Another manifestation of a more generous treatment of the privilege appears in a recent opinion by Mr. Justice Harlan: In United States v. Noto, 2 Cir., 226 F.2d 953, 954, a majority of this court, in an opinion by Judge Medina, refused to modify a district court order fixing at $30,000 the bail of a defendant pending decision before trial under the Smith Act, 18 U.S.C. § 2385 on an indictment charging that the defendant had been a member of the Communist Party since 1946. One reason the trial judge had assigned for exacting the large amount of bail was that, on defendant's motion to reduce bail, he would not disclose his whereabouts or the nature of his employment from 1946 to 1951. The defendant contended that to penalize him for not revealing these facts was to infringe his privilege against self-incrimination. Judge Medina wrote: 'The claim of some infringement of defendant's constitutional rights under the Fifth Amendment is wholly without merit. It was defendant's choice to withhold information as to his background, which is always of significance in fixing bail.' Judge Clark dissented, saying in part that Judge Medina's opinion 'underestimates the force of (the defendant's) constitutional objection, which is that, while he may be allowed in form the benefit of the Fifth Amendment against self-incrimination, yet all the force of that great privilege is derogated by his facing confinement for resort to it.' Justice Harlan, as Circuit Justice, reversed and granted reduction of bail; see United States v. Noto, 76 S.Ct. 255, 257. Although he had dissented in Emspak, in his opinion in Noto's case he stated: 'No doubt a defendant's past history and activities are relevant circumstances to be considered in fixing proper bail. But it would seem that in fixing bail, as in a criminal trial, an unfavorable inference should not be drawn from the mere fact that the Fifth Amendment privilege has been invoked. Assuming that a court when fixing bail can consider the absence of information concerning a defendant's history, even though the absence results from a valid claim of the privilege, that should be a permissible consideration only to the extent that it bears upon the risk that the defendant will not be available for trial. * * * I think it not sufficient to argue that the burden of proof was on petitioner, for in the setting of this case that seems to me but another way of saying that petitioner could only escape high bail under pain of waiving his Fifth Amendment privilege.'
 
 
 98
 5. It may perhaps be suggested that the error here is 'harmless.' That suggestion cannot stand up, for two reasons: (a) The evidence against Halperin is not overwhelming. The jury could reasonably have acquitted him. (b) More important, if what I have said above is sound, the error here consisted of an invasion of a constitutional right. Such an error cannot be deemed harmless. See, e.g., United States v. Morgan, 2 Cir., 222 F.2d 673; Helton v. United States, 5 Cir., 221 F.2d 338, 342; Wrightson v. United States, 95 U.S.App.D.C. 390, 222 F.2d 556, 561.
 
 
 99
 6. In the background of cases like this, lies a question which I believe the Supreme Court has never squarely considered:[13] The Fifth Amendment provides that the accused shall not be compelled to testify against himself. At the time of the adoption of that Amendment, it was well settled that, in a felony trial, the accused could not testify even if he desired to do so. Consequently, at that time and until 1878, a federal jury could not in fact, and would not, infer that the defendant's silence in any way indicated his guilt. In 1878, however, Congress enacted the statute (now 18 U.S.C. § 3481) giving the accused an election to testify. It has been generally assumed that such statutes embody a wise policy favorable to accused persons who are innocent. But we should note that, in many European countries (other than England), countries surely no less civilized than ours, the inability of the accused to testify still maintains, and that there the policy behind that rule has wide approval as protective of the innocent (See discussion in point II of the Appendix to this opinion). It is notable, too, that shortly after the enactment of the federal statute of 1878, Maury, a learned American lawyer, published an article which reasoned plausibly that this statute unconstitutionally invaded the Constitutional privilege.[14]
 
 
 100
 Perhaps the Supreme Court will not soon so hold. But I suggest that-- as Maury anticipated and as many experienced lawyers and judges have explained-- such a statute often has the effect of coercing a defendant into abandoning his privilege and thus frequently forces an innocent defendant to give testimony, on cross-examination, gravely damaging to his defense.[15]
 
 
 101
 For if he does not use his statutory option to testify, the jury will usually infer his guilt from his silence. In United States v. Bruno, 2 Cir., 105 F.2d 921, 923, 924, this court (per Judge Learned Hand)-- in holding that it was not error for the trial judge to refuse to charge the jury that they must make no such inference-- said that the advantage to the accused of such a charge is 'wholly illusory; and only serves to put before (the jury) what will generally harm the accused. * * *' Although reversing us, the Supreme Court-- Bruno v. United States, 308 U.S. 287, 60 S.Ct. 198, 200, 84 L.Ed. 257-- acknowledged, in effect, that such an admonition to the jury is 'psychologically futile,' since it is 'psychologically impossible not to have a presumption arise against an accused who fails to testify.' A New York Commission on the Administration of Justice said in 1930: 'It is undoubtedly the fact that juries do consider a defendant's silence as a circumstance against him, despite the limited admonitions of the trial judge.' An English commentator wrote in 1901, 'There can be no doubt that now almost everyone called to serve on a jury knows that a person can give evidence if he chooses, and every day, probably, juries look with growing suspicion upon accused persons who refuse to do so.'[16] 'The number of defendants who fail to testify and who are yet acquitted must be almost negligible,' writes McCormick, Evidence (1954) 280.
 
 
 102
 Yet an innocent man may have good reason for not testifying. 'It is not everyone', said the Supreme Court in Wilson v. United States, 149 U.S. 60, 66, 13 S.Ct. 765, 766, 37 L.Ed. 650, 'who can safely venture on the witness stand though entirely innocent of the charge against him. Excessive timidity, nervousness when facing others and attempting to explain transactions of a suspicious character, and offenses charged against him, will often confuse and embarrass him to such a degree as to increase rather than remove prejudices against him. It is not everyone, however honest, who would therefore willingly be placed on the witness stand.' On that account, it was said, in State v. Cameron, 40 Vt. 555, 565-566: 'In the great body of cases no wise practitioner would permit his client, whether he believed him guilty or innocent, to testify when upon trial on a criminal charge. The very fact that he testifies as if with a halter about his neck, that he is under such inducement to make a fair story for himself, his character and his liberty if not his fortune and his life being at stake, is enough to usually deprive his testimony of all weight in his favor, whether it be true or false. This is the case even when his manner upon the stand is unexceptionable, while his critical condition often creates such apprehension and excitement that his manner is open to great criticism, and if he does make a misstep after voluntarily assuming the responsibility of testifying, it will naturally be construed strongly against him. In short, his testimony is far more likely to injure him seriously than to help him a little. It is true that a clear intellect and perfect self-possession may enable an unscrupulous rogue to run the gauntlet of a cross-examination and make something out of this privilege, and the same qualities will be still more likely to help an innocent man to some advantage from it, but the true application of the statute is only to those rare cases, when a word from the prisoner, and him only, will manifestly dispose of what otherwise seems conclusive against him.'
 
 
 103
 If an innocent man, coerced by the inference that will be drawn from his silence, does testify, he finds himself in a serious plight. For instance, the Supreme Court has held-- Reagan v. United States, 157 U.S. 301, 15 S.Ct. 610, 613, 39 L.Ed. 790-- that the trial judge may properly (and often indeed should) tell the jury that 'interest creates a motive for false testimony; that the greater the interest the stronger is the temptation; and that the interest of the defendant in the result of the trial is of a character possessed by no other witness, and is therefore a matter which may seriously affect the credence that shall be given to his testimony.'[17]
 
 
 104
 Wherefore, in Ruloff v. People, 45 N.Y. 213, 221-222, the court said: 'By statute (ch. 678 of the Laws of 1869) persons upon trial for crime may, at their own request, but not otherwise, be deemed competent witnesses. The act may be regarded as of doubtful propriety, and many regard it as unwise, and as subjecting a person on trial to a severe if not cruel test. If sworn, his testimony will be treated as of but little value, will be subjected to those tests which detract from the weight of evidence given under peculiar inducements to pervert the truth when the truth would be unfavorable, and he will, under the law as now understood and interpreted, be subjected to the cross-examination of the prosecuting officer, and made to testify to any and all matters relevant to the issue, or his own credibility and character, and under pretence of impeaching him as a witness, all the incidents of his life brought to bear with great force against him. He will be examined under the embarrassments incident to his position, depriving him of his self-possession and necessarily greatly interfering with his capacity to do himself and the truth justice, if he is really desirous to speak the truth. These embarrassments will more seriously affect the innocent than the guilty and hardened in crime. Discreet counsel will hesitate before advising a client charged with high crimes to be a witness for himself, under all the disadvantages surrounding him. If, with this statute in force, the fact that he is not sworn can be used against him, and suspicion be made to assume the form and have the force of evidence, and circumstances, however slightly tending to prove guilt, be made conclusive evidence of the fact, then the individual is morally coerced, although not actually compelled to be a witness against himself.'
 
 
 105
 It follows that, thanks to the statutory option, the accused is often confronted with this dilemma: He will be gravely disadvantaged if he does testify or if he does not. So much the more reason, then, for not making a further extensive inroad on the privilege, by augmenting the dilemma, in a case like Halperin's. For, if my colleagues' ruling stands, the accused, virtually coerced by the statutory option into testifying at his trial, will discover that, as an added result of so choosing, he must tell the jury that he had previously exercised his privilege as a witness before the grand jury.
 
 
 106
 7. There are those who assert that the Supreme Court's recent generous interpretation of the privilege does not accord with the history of its origin in England or in the American Colonies.[18] It might be argued that these critics are in part correct: The English Puritans who fought against the oath ex officio were criminals (i.e., heretics); they feared that, were they compelled to tell the truth under oath, they would suffer at the hands of the High Commission.[19] The leading American colonists who strenuously objected to general warrants were also criminals, i.e., engaged in smuggling violative of valid legislation. In all likelihood, the provision of the Fifth Amendment, which prohibits a man's compulsion to testify against himself, arose, like the Fourth Amendment's prohibition of unreasonable searches and seizures, from the experiences of those smugglers[20] (who regarded their smuggling as a 'natural right' justified by 'the Great Law of Nature and Reason,' as among 'the rights of man').[21] The critics of the Supreme Court, however, in their over-emphasis on the history of the Fifth Amendment privilege, overlook the fact that a noble principle often transcends its origins, that creative misunderstandings account for some of our most cherished values and institutions; such a misunderstanding may be the mother of invention.[22] Thus religious intolerance constituted a major factor in the development of modern doctrines of liberty.[23] 'The insane ages,' writes Gilbert Murray, 'have often done service for the sane, the harsh and suffering ages for the gentle and well-to-do.'[24] The Supreme Court's critics are guilty of the fallacy of 'reduction' (the 'nothing but' fallacy), akin to the evaluation of anything solely in terms of its ingredients (as in the case of the critic who described a Beethoven symphony as nothing but horses hair over cats' guts). 'If,' wrote Holmes, 'truth were not often suggested by error, if old implements could not be adjusted to new uses, human progress would be slow.'[25] So the Supreme Court in Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495, adhered to the two-witness rule in perjury prosecutions for a rational reason while discarding the old irrational reason which originally supported it.[26]
 
 
 107
 8. The foes of the privilege-- beginning with Bentham-- have mistakenly viewed it solely from a procedural angle; so considered, it seems to them an unjustifiable obstacle to the judicial ascertainment of the truth. They ignore the fact that the privilege-- like the constitutional barrier to unreasonable searches, or the client's privilege against disclosure of his confidential disclosures to his lawyer[27] -- has, inter alia, an important 'substantive' value, as a safeguard of the individual's 'substantive' right of privacy, a right to a private enclave where he may lead a private life.[28] That right is the hallmark of our democracy.[29] The totalitarian regimes scornfully reject that right.[30] They regard privacy as an offense against the state. Their goal is utter depersonalization. They seek to convert all that is private into the totally public, to wipe out all unique 'private worlds,' leaving a 'public world' only, a la Orwell's terrifying book, '1984.' They boast of the resultant greater efficiency in obtaining all the evidence in criminal prosecutions. We should know by now that their vaunted efficiency too often yields unjust, cruel decisions, based upon unreliable evidence procured at the sacrifice of privacy. We should beware of moving in the direction of totalitarian methods, as we will do if we eviscerate any of the great constitutional privileges.[31]
 
 APPENDIX I
 
 108
 Maury, Validity of Statutes Authorizing the Accused to Testify, 14 Am.L.Rev. (1880) 48, wrote, in part, as follows: 'The interesting inquiry which now presents itself for our consideration is, whether the legislation authorizing the accused to testify in their own behalf, which has become so general, is consistent with the principle, that a man cannot be compelled to testify against himself.
 
 
 109
 'This legislation embraces statutes of two classes; that is to say, statutes which contain the provision that the omission of the accused to testify shall not operate against him or be in any way considered by the jury, and statutes which do not contain this provision, or anything equivalent to it.
 
 
 110
 'It seems to us that both classes of statutes are invalid, as being contrary to the great principle that a man shall not be compelled to be his own accuser, in this, that, although they profess to leave it to the accused to become a witness or not, they, in reality, force him to take the stand to protect himself from the inference of guilt which is almost sure to be drawn against him if he fail to do so, and the case call for an explanation on his part. He may be never so innocent, yet his omission to testify must always be at the risk of condemnation on the presumption of guilt founded on his silence when the law gives him an opportunity to speak.
 
 
 111
 'Thus driven to take the stand by a moral coercion, in whose presence the option or election to testify or not, given by the law, becomes a solemn mockery, he must submit to a hostile and searching cross-examination coextensive with the whole case. Filled with the terror and distraction which usually take possession of the minds of the innocent from the moment they become the objects of a criminal prosecution, paralyzing their reasoning powers, the scene swims before him, and he becomes involved in contradictions and improbabilities of statement which the jury, who view him with suspicion and distrust anyhow, receive as controlling evidence of his guilt.
 
 
 112
 'It is true that he takes the stand ostensibly to testify for, and not against himself; but we must not be misled by a phrase, for once upon the stand, he can be cross-examined as to the whole case by the prosecution, and must, it is agreed on all hands, answer all relevant questions propounded to him, on pain of incurring the damaging consequences of refusal to do so. Thus, after taking the stand for his own protection, he finds himself, in consequence of the bewildering effects of the cross-examination directed against him, in a worse situation than if he had been called as a witness against himself by his accusers.
 
 
 113
 'But it is argued that the accused cannot suffer by declining to take the stand, because the court does not permit the prosecution to comment on the fact, and instructs the jury that they must not allow it to operate against him, while in some States the law provides, expressly, that the failure of the accused to become a witness shall not prejudice him in any way.
 
 
 114
 'It may be asked, in reply, whether it is in the power of courts or legislatures to prevent the accused's failure to testify from prejudicing him in the minds of the jury. It is a fact in the case which the jury have derived from the infallible evidence of their own senses, and which must needs force itself on their minds. The failure of an accused to make an explanation in reply to an extra-judicial imputation of crime is not only relevant but strong evidence against him; but how tremendous must be the effect of his silence on that supreme occasion which is to decide forever the question of his guilt or innocence? * * *
 
 
 115
 'You might as well try to 'bind the sweet influences of the Pleiades or loose the bans of Orion' as try to erase from the minds of the jury a material relevant fact which has become a part of their consciousness through the evidence of their own senses. Indeed, if it were possible for the mind to escape the influence and effect of such evidence, there is no test by which it could be determined whether that result had been attained. * * *
 
 
 116
 'We conceive that it is no more within the power of courts and legislatures to withdraw this fact from the consideration of the jury, than it is to compel them to ignore the impressions made on their minds by the conduct and bearing of the accused in their presence on his trial. The legislature or court might just as well declare that no evidence shall be heard, as that a relevant fact in evidence shall have no significance at all, or only such significance as it may choose to give it.'
 
 
 117
 In Stephen, Prisoners on Oath (1898), an experienced English barrister discussed the effects of a statute which, in respect of some particular crimes, allowed the accused to testify; he objected to the then pending legislation (subsequently enacted)[32] extending this option to those accused of any major crime. Stephen wrote, in part, as follows:
 
 
 118
 'I allege that an innocent person is not less but more likely to be convicted if he can be heard as a witness for himself than if he cannot, and it is my present endeavour to show how this comes to be so. What I have to say on this head is the result of twelve years' observation of the working of the 20th section of the Criminal Law Amendment Act, 1885. That section makes every person accused of an offense under that Act, or any one of several other specified offences, a competent witness on his own behalf. The well-known theory of the criminal law is that the prosecutor, who alleges the commission of a crime, must clearly prove that it was committed, and that, unless the jury are, in the time-honoured phrase, 'satisfied beyond all reasonable doubt' that it was, and that the prisoner did it, they must find a verdict of 'Not Guilty'. This fact, by-the-way, is constantly left out of sight by persons who urge that the prisoner ought to be a competent witness for the same reasons for which a party to a civil action ought to be competent, but it is good law for all that. And not only is it good law, but, as long as the prisoner cannot give evidence, the practice of juries closely corresponds with it. * * * It is this attitude of mind on the part of juries which is the real safeguard of innocent persons unfortunately-- or through deliberate perjury-- placed in suspicious circumstances. * * *
 
 
 119
 'I am perfectly convinced, by prolonged observation, that where prisoners are competent witnesses, and give evidence the attitude of mind which I have ascribed to juries in criminal cases generally disappears altogether. They no longer ask themselves, 'Has the Crown proved that he did it?' They ask, 'Did he do it?' This is quite a different question, and far less favorable to the prisoner. Where the prisoner cannot give evidence, the jury exact a standard of proof; where he has given evidence, they strike a balance of probabilities.
 
 
 120
 'Another general proposition which, unless my observation deceives me, is true of juries, is that they always draw the inference that a prisoner who tells them lies in his evidence is guilty of the crime with which he is charged. It is a very natural inference, but it is not invariably well founded, and it does not follow that, because a man tells lies about where he was on a particular occasion, he ought to be convicted, say, of a murder which he did not commit. Nor is the disposition to tell lies, though innocent, very exceptional. It frequently happens that circumstances of which a man has reason to be ashamed are the very facts which have brought, or helped to bring suspicion upon him. To take the obvious case: it may be the foundation of a criminal charge that the prisoner was seen in the immediate neighborhood of the crime when he had no business to be there. The fact is that he was making love to a woman whose reputation would be seriously compromised if the truth were known. It is obvious that in such a case, if the man is tried, and is a competent witness, he is extremely likely to swear that he was not there, and it may very well be that owing to his not being a plausible liar, or to other circumstances for which he cannot account, or the like, the jury will not believe him. If they do not, they are almost certain, in my experience, to convict him. Some people seem to think that if a man has done anything wrong, however, venial, and tells a lie about it, he ought to be convicted of anything, however serious, with which he is criminally charged. I cannot share that opinion. I well remember a case of arson, in which the counsel for the defence confided to me the difficulty he was in, because he had been instructed that the prisoner was in fact on the spot where the witnesses deposed to seeing him, for a reason which he did not choose to avow, just before the fire broke out. He was eventually able to make such a strong case of accident, which, I felt no doubt, was the true explanation, that the man was acquitted, but I would have given very little for his chance of escape if he had been called as a witness. * * *
 
 
 121
 'The value of an oath is not that it restrains the mendacity of dishonest witnesses, but that it makes honest witnesses, who are, of course, the great majority, more careful. For that reason I think the practice of swearing witnesses is worth maintaining. But its application to accused persons appears to me in the last degree objectionable. I have mentioned that witnesses may (sometimes) be hampered in telling lies by the fear of prosecution for perjury. I suppose a guilty prisoner might also be afraid of being prosecuted, but as to this I hold the strongest opinion, that practically to induce a man to be sworn as a witness and tell a string of lies, and then to prosecute him for perjury for having told the lies, would be cruel, unfair, and totally unworthy of English justice.
 
 
 122
 'Of course I know that, theoretically, a guilty man ought not to venture to swear to his innocence, but it might just as well be urged that a guilty man ought to be truly penitent and to plead guilty. Morally speaking, so he ought, but it is not expected of him. There is also this objection to the swearing of prisoners, that, rightly or wrongly, it leads, and must lead in fact, to an immense quantity of perjury, which would otherwise not be committed; that perjury in itself is a most undesirable thing, and that the constant spectacle of a great mass of obvious and unquestionable perjury cannot fail to weaken the existing feeling-- which is not by any means too strong-- of the sanctity of a witness's oath. The matter may be stated compendiously as follows: A guilty prisoner, called as a witness, is bound to tell a lie by the sanction of knowing that he cannot escape conviction if he tells the truth. That sanction is so strong that the practically trifling sanction consisting of the fear of breaking an oath (apart from the fear of being prosecuted for perjury) amounts to nothing in comparison with it. Therefore putting him on oath will not in any degree make him more likely to tell the truth. Therefore there is nothing to be gained by putting him on oath.
 
 
 123
 'The case of an innocent prisoner is no better. If the jury will not believe his evidence (after examination and cross-examination) given not upon oath, they most certainly will not dream of believing it, or attaching any greater weight to it, merely because it is given on oath. And in this they will be perfectly right. * * *
 
 
 124
 'By far the best way of estimating how the competence of prisoners, if made general in this country, would work, is seeing how it has worked in this country in the particular cases in which it has existed for some years. * * * It does not make it easier for innocent prisoners to secure acquittal. The idea that it does so is a fallacy, natural enough if one had no experience, but exposed by the practical working of the law of competence. It does, however, on the contrary, make it more likely that innocent prisoners will be convicted.'
 
 
 125
 In discussing an English criminal trial, it was said by Rowan-Hamilton, The Trial of Alexander Dickman (1914): 'When the Criminal Evidence Act of 1898 was passed, enabling a prisoner in every case to give evidence, the opponents to the bill protested that the onus on the part of the prosecution to prove their case would be shifted to the prisoner, who would be required henceforward by juries to prove his innocence. There is little doubt that this has come to pass. * * * A man of slow comprehension, cross-examined by an astute counsel, by the very stupidity of his answers, often leaves a damaging impression on the minds of the twelve, and convicts himself. A totally different impression might be created by a nimble liar. But one thing is certain, juries now expect to see the accused in the witness-box.'
 
 
 126
 In Johnston, Evidence of Accused Persons, 4 Dominion Law Reports (1931) an experienced trial lawyer writes:
 
 
 127
 'In dealing with the question of calling the accused as a witness on his own behalf in a criminal prosecution, the only practical arguments available are those based on experience. In this branch of legal work, precepts and wise theories are of no value. * * * A general rule with its proverbial exceptions is the extent prudence permits one to go, and that rule is, never put the accused in the box. At times it may be safe and absolutely necessary to allow the prisoner to give evidence on his own behalf, but these are the very rare exceptions. Generally, and whether innocent or guilty, he assists, by his story of the facts, in convicting himself, and the reasons for this are apparent when some degree of consideration is given to the matter. * * *
 
 
 128
 'Another strong argument, and again it is more the result of experience than of theory, is that the evidence of a man on trial for a crime, however small the crime may be, is greatly weakened by reason of the existence of the powerful influence of self-preservation. Juries know this as well as lawyers do. In the case of murder, what would not most men swear to in order to save their lives? And in less serious offences such as larceny, forgery and the like, it is a safe prediction that the man who is criminal enough to commit such an offence is generally quite criminal enough to swear falsely. * * * The position taken by the accused in giving evidence is a trying one. Assume his innocence to be a fact, he feels the importance of his testimony to such an extent that the thought unnerves him. His evidence may be perfectly true. His manner of giving it, for the reasons suggested, may be convincing as to its falsehood. On the main facts he may be compelled, if a truthful man, to corroborate the case for the prosecution and yet be innocent of the crime charged in the indictment. The color given to an honest act by its relative surroundings may so change its character as to make it proof of guilt in the eye of the jury. It is always easier to deny a statement than to explain its collateral bearings, and an experienced counsel seldom attacks the main facts deposed to, but leads the witness quietly and unsuspectingly into the by-ways and lanes leading up to the principal issue. Here, he secures admissions and statements favorable to the Crown, and the denials of the chief facts alleged in evidence against the accused are so weakened or qualified as to render them of no value.
 
 
 129
 'Where evidence other than the prisoner's is called for the defence, it will be found that it is either positive or explanatory. If the jury do not believe this testimony, it is almost unnecessary to argue that they will not believe the story of the prisoner. His statements cannot do more as a rule than corroborate the witnesses already called on his behalf, and if these witnesses are not believed, very little, if any, weight will be given to the corroboration. If they do believe his witnesses, there is an end of the case, if the facts are at all material, and a great risk is avoided, and many apparent dangers escaped by not calling the accused. Many a clean, strong defence is utterly ruined by the suspicion cast upon it through the hesitating nervous conduct of the prisoner as a witness. The jury are apt to find guilt not because the Crown case is strong, but more often because the accused having undertaken to prove his innocence, has not succeeded in doing so. * * *
 
 
 130
 'The fear of falling into a trap, the desire to put the best side of the story foremost, and the anxiety to explain away doubtful points, tend to increase the difficulties in the way of even an honest and innocent prisoner. The feelings and desires hamper a witness very much, and the moment hesitation in manner or speech becomes apparent, much injury is done to the defence. * * * Every contradiction, however slight, is apt to be taken as another evidence of guilt. * * * All prisoners who stand their trial profess innocence. This fact bears heavily against belief in the truth of their evidence when given. Assume rightful convictions, and the evidence or denials of accused persons generally must be untrue. They therefore offer to the jury a statement which belongs to a class of testimony always false, in cases of conviction, if the conviction be proper. The guilty man denies his guilt. This weakens the denial by the innocent and detracts from its weight with the jury. Every man tried for crime cannot be innocent. Denials by the innocent are weighed in the same scales as the evidence of the guilty. When a prisoner goes before a petit jury, they are apt to look upon his assertions of innocence as a matter of course, and what may always be expected. We say when we hear of a prisoner giving evidence, 'Of course, he will deny the charge.' This feeling creates the great element of doubt. * * *
 
 
 131
 'Another and a grave danger in examining the accused consists in the fact that the door is thereby opened to a question of character. The Crown can offer no evidence of bad character, except indirectly in showing other similar crimes in certain cases to prove the act to be that of design, and not of accident. But when the prisoner is called, his past life becomes the subject of inquiry, and it is not the happy lot of every man to be able to stand before a Court and Jury, and give his record without some fears and misgivings. Innocent acts may look black indeed, when viewed under such circumstances as exist in a criminal trial, where the accused is suspected and perhaps already convicted in the minds of the jury and spectators. Explanations do not always satisfy the listeners. Private and long-buried events are paraded in public. Sins of which the prisoner may have sincerely repented or for which he has paid the full penalty, are raked up, and he is confronted with matters, now half forgotten, or for many reasons incapable of explanation. No man's record is so perfect, that it cannot be reached by the tongue of the slanderer or the knife of the enemy, and few men can produce evidence to support their contention of innocence after the lapse of many years, even if such evidence were admissable.'
 
 
 132
 APPENDIX II*
 
 
 133
 (A) In Western Europe, the privilege against compulsory self-incrimination is embodied in a system which recognizes a middle ground between (a) complete disqualification totally precluding a person unable to take the oath from giving evidence (as was the case with 'interested parties' at common law; see 2 Wigmore, Evidence, (1940) Sections 575-599) and (b) absolute qualification whereby all testimony must be given under oath subject to cross-examination, impeachment and the penalties of perjury.[33] This system is partially analogous to that of the English courts in the 19th century and of present-day Georgia, in that the accused, though not permitted to take the stand, is allowed to make an unsworn statement. As to this practice at common law see Wigmore, supra, Section 579; Orfield, Criminal Procedure (1947) 349-50; Plucknett, A Concise History of the Common Law, (14th Ed. 195) 1412; I Stephen, History of the Criminal Law (1883) 460. A significant distinction exists, however, since at common law the unsworn statement permitted to an accused was usually not allowed to be considered as evidence, but merely an argument on 'what he claimed to be the facts.' '* * * no finding can be founded by the jury on the strength of such a statement;' Commonwealth v. Stewart, 1926, 255 Mass. 9, 151 N.E. 74, 77, 44 A.L.R. 579, reviewing history and authorities.[34] In European practice generally the accused's unsworn statements do constitute evidence and may be given conclusive weight in his favor by the triers of fact; at the same time he is not compelled to make even unsworn statements, and disqualification from taking the oath precludes him from temptation to lend greater weight to his statements by committing perjury. For details of this practice in individual countries see (B) infra. For the rationale behind the European rules, and its resemblance to the reasoning advanced by English and American courts and commentators prior to the passage of enabling acts giving an accused the option to testify see (C), infra.
 
 
 134
 (B) 1. In Scandinavia, the privilege against self-incrimination, which is more extensive than that afforded in either Anglo-Saxon or Continental countries, appears as part of a general policy to avoid compelling testimony from persons reluctant to give it, since such compulsion invites perjury.[35] Thus in Norway no person called as a witness in any proceeding may be required to answer a question which could expose him or 'his nearest' to criminal liability or loss of community esteem. Lov om rettergangsmaaten i straffesaker, 1 July 1887 (hereinafter STRPL) Section 177. ('His nearest' as defined by STRPL Section 176 includes members of his immediate family, brothers-and sisters-in-law, fiancees, adopted parents and foster children. As a corollary of the rule against self-incrimination, persons standing in this relationship to an accused may decline to testify at his trial). 'Loss of community esteem' has several times been the subject of interpretation by the Supreme Court, which has given it a broad construction, pointing out that moral evaluations vary with time, place and persons. See, e.g., decisions at 1895 N.Rt. 850; 1896 N.Rt. 221; 1909 N.Rt. 623; 1912 N.Rt. 203. Nor need the loss of community esteem be devastating; the witness may decline if it would be reduced 'a notch.' 1895 N.Rt. 850. And see Stang, 138-140.
 
 
 135
 An accused may never be put under oath; furthermore, he may decline to make any statement whatever. At the beginning of the pretrial inquiry or the trial the court must ask whether he wishes to make an unsworn statement or answer questions. STRPL Sections 255, 261. If he declines, that ends the matter; and if he consents to participate he may still refuse to answer any given question. STRPL Section 255. At trial he may comment upon or explain the evidence as it is presented. STRPL Section 261. He may subject himself, to the extent he desires, to examination by defense counsel and cross-examination by the prosecutor. The court must assist him by calling to his attention any inconsistencies and inviting him to correct them. STRPL Section 329(1). He may not be impeached by inconsistent statements made out of court, and no confession signed out of court, regardless how voluntarily, may be introduced against him. STRPL Section 329(2). And see Stang, op. cit. supra, 194-195. The triers of fact may assign whatever weight they deem proper to his statements, id. 128-130. The furthest the court may go in encouraging even an unsworn statement is to advise an accused that his failure to explain certain facts may possibly count against him, STRPL Section 260; and his right to lie with impunity is specifically provided for by statute, STRPL Section 167.
 
 
 136
 Protection against self-incrimination is further assured by the fact that a judge rather than a grand jury affords the sole means by which the prosecutor can compel testimony of witnesses prior to trial. In the pretrial proceedings, as soon as suspicion is directed at a particular accused, he can no longer be regarded as a witness (who may invoke his privilege only as to particular questions) but acquires all the rights of an accused, including the right to silence and representation by counsel. These advantages are regarded as considerable. See Andenaes, 1941 Tidsskrift for Rettsvitenskap 475ff. The judge alone may question suspects in these proceedings. And STRPL Sections 255-260 strictly regulates the form and content of the questions that may be asked. Thus, there may not even be a suggestion that he confess; the questions must be put politely; leading, captious or suggestive questions are forbidden. The same applies to questions asked at trial. See also I Salomonsen, Straffeprocesslov (1925) 284-294.
 
 
 137
 2. In Germany the witness' protection against self-incrimination is limited to facts tending to prove guilt of a criminal offense, Strafprozessordnung, 12 September 1950 (hereinafter StrPO) Section 55. The right to decline to answer, however, applies also to matters which might incriminate the same members of the family to whom the exemption applies in Norwegian law (see above) and those persons are similarly exempt from testifying against an accused. StrPO Section 52. Any person called as a witness must be instructed by the court of his right to refuse to answer incriminating questions; StrPO Section 55(2).
 
 
 138
 Not only may an accused never be put under oath; it is considered basic to the entire code of criminal procedure that he be completely free to reply or abstain from replying to the accusations; see Schmidt, Lehrkommentar zur Strafprozessordnung (1925) 58-65.[36]
 
 
 139
 On the other hand, the accused has the right at all stages in a criminal trial to comment upon and explain the evidence as it is presented (StrPO 257) and to present his views on factual and legal questions (StrPO 258(1)(2)). Questioning of a suspect or accused at the pretrial proceedings is, as in Norwegian law, the function of the judge alone, and is regulated in much the same manner by StrPO Sections 133-136. Refusal to make even an unsworn statement is not legally a basis for inference of guilt. That the system of evaluating the evidence may lead to the drawing of such inferences, see Silving, 69 Harv.L.Rev. at 696 n. 54 (1956). But evidentiary weight may be ascribed to an accused's unsworn statements in his own favor, a proposition that is not startling when it is remembered that in Germany witnesses may, and do, at the discretion of the court, testify without taking the oath. See StrPO Sections 60-62; Bahna, Strafprozessrecht (1929) 106.
 
 
 140
 3. Swiss law appears to afford a witness protection against self-incrimination. Articles 41 and 155 of the Swiss Federal Criminal Procedure Act (Bundesgesetz uber die Bundesstrafrechts pflege June 15, 1934, Bereinigte Sammlung der Bundesgesetze 1848-1947 Vol. 3 at 303) implicitly prohibit the extortion under pressure, threat, promise or false statement, of testimony of the accused. It also, it is generally assumed, prohibits giving a self-incriminatory evidence; see Giezendanner, Die Stellung des Beschuldigte im Bundesstrafprozess im eidgenossischen Behorden 30, 66. The Cantons recognize such protection. Thus, e.g., in Bern Canton the Gesetzbuch ueber das Verfahren in Strafsachen, 29 June 1854 (hereinafter StrV) Section 141(2) provides that no witnesses may be required to answer a question if to do so might subject him to civil or criminal liability. Since, however, that section has been interpreted to include matters adversely affecting his honor, the protection is in fact almost as broad in Switzerland as in Norway; see Stalder, Ausnahmen von der Zeugnispflicht (1937) 40-48. The witness is also entitled to invoke the privilege to avoid testifying against members of his family to the same extent as if he himself were concerned; StrV Section 141(1). The court is under a duty to advise each witness of his privilege before he testifies; Stalder, supra.
 
 
 141
 An accused in Switzerland falls into the category of disqualified rather than unreliable witnesses; Stalder, supra, 25-29. The distinction is significant since the basic principle of Swiss Criminal procedure is that of avoiding any compulsion on an accused (see StrV Section 106): 'The accused * * * may be used to supply evidence, but only when he freely offers himself for that purpose.' Stalder, op. cit. supra, p. 30. Since any statements made under oath would, if adverse to his interests, be made under compulsion of the perjury statute, any statement he makes must be free from that compulsion.
 
 
 142
 4. Elsewhere on the European Continent, while the protection afforded witnesses against compulsory self-incrimination varies, the uniform practice as to an accused is (1) disqualification from taking the oath and (2) freedom to give evidence in his own behalf without fear of punishment for lying; see Schlesinger, Comparative Law 208-209 & fn. In Scandinavia, Switzerland and Germany there is (3) considerable freedom from compulsion even to make unsworn statements on the theory that the accused (see (C), infra) must be unhampered in his defense; at most an unfavorable inference may be drawn from silence, never a presumption of guilt. See, e.g., STRPL Section 377. (If no contrary reason appears, refusal to make an unsworn statement may be taken as a guilty plea in cases of minor misdemeanors only; no inference if the statement is inadequate.) In other countries, like France, there may be considerable pressure exerted to obtain a statement or even a confession. France does not permit a privilege against self-incrimination to witnesses; 2 Le Poittevin, Code d'instruction criminelle annote (1926) 53-54. And the provisions of the Code Criminelle concerning questioning of the accused and his relatives (the latter being disqualified rather than, as in the three countries discussed above, being permitted to decline to testify) demonstrate clearly that the disqualifications are not, in that country, designed to protect the rights of the accused and his family, but to protect the court against unreliable evidence. See Stalder, op. cit. supra, pp. 26, 40, 41 for Swiss criticism of both France and Germany for inadequate protection of witnesses against compulsion to testify adversely to their own interests, and France for inadequate protection of the accused.
 
 
 143
 (C) Disqualification of an accused together with absolute freedom on his part to lie with impunity, are almost unanimously regarded by European commentators as indispensable to the most important achievement of criminal law reform in the 19th century, i.e., a transition from 'inquisitorial' to 'accusatory' procedure. In the former an accused was under a duty to answer questions truthfully, however adverse to his defense, and to participate in the proceedings which led to his conviction; in accusatory procedure the accused is free to defend himself as he sees fit, and must be under no compulsion at any time to give evidence adverse to his cause. Schmidt, op. cit. supra, pp. 58-59 (German law); Nissen, Die Durchfuhrung des Anklageprinzips im norwegischen Strafprozess (1918) 3-8 (Norwegian law); Stang, op. cit. supra, pp. 19-21 (same); II Castberg, Norges statsforfatning (2nd Ed. 1947) 404-406 (Norwegian Constitution: Effect of construction of constitutional prohibition of torture as precluding any compulsion on accused to give an explanation); Stalder, op. cit. supra, pp. 40-41. The privilege against self-incrimination accorded to witnesses is derivative of the protection afforded an accused: complete freedom of defense would be jeopardized if a person could be called upon in a proceeding to which he was not a 'party' and forced to testify as to those matters which the disqualification of an accused was designed to exempt him from compulsory disclosure. Ibid.
 
 
 144
 1. The right of an accused to testify, since in fact it is deemed to amount to a compulsion to testify, is 'not in accordance with the pure principles of accusatory procedure.' Brangsch, Vorleben und Vorstrafen des Angeklagten als Indizien im englischen Strafprozess (1953) 6-7. '* * * the right to testify is, for the accused, a gift of a two edged sword * * * Certainly, there is no duty to testify * * * However, the refusal of an accused to testify as a witness in many cases has the effect of a confession in the minds of the jury * * * In this manner, the right of the accused to testify becomes in fact a compulsion to testify; and in an age of highly developed cross-examination it is quite possible for the unscrupulously aggressive prosecutor to bring an innocent accused into grave danger of conviction.' Ibid. Compare II Wigmore, Section 579; for comparable arguments by English and American authorities: Ashley's statement, id. p. 706 that permission to testify amounts to compulsion to testify; Steele and Sawyer's statements, p. 703, on the dangers to an innocent accused.
 
 
 145
 2. European commentators also support disqualification from taking the oath on the ground that to allow such oath taking would in fact constitute compulsion to commit perjury. The accused would feel the need to lend weight to his words by subjecting himself to the oath, and once he had taken it, all his natural instincts would be to lie away matters disfavorable to his cause. In Europe it is regarded as completely inconsistent with accusatory (as opposed to inquisitorial) procedure to punish an individual for lying in his own defense, when his personal freedom is threatened by the State in the form of a criminal prosecution. See Schmidt, op. cit. supra, pp. 58-60; 62-65. To put an individual-- witness or accused-- in a position where his natural instincts and personal interests dictate that he should lie (be these interests the avoidance of criminal sanctions, loss of property or honor to himself or his family) and then punish him for lying, is regarded as an intolerable invasion of his 'personality'. Stalder, op. cit. supra, pp. 29-31; (partially a Swiss criticism of German law for not allowing a witness to decline to testify as to matters affecting his property rights and civil disabilities.) To threaten an accused with punishment, allow him to defend himself against that threat, by taking the oath and committing perjury, and then punish him for the perjury, is an 'absurdity'. Schmidt, op. cit. supra. In effect, the state would be forcing him to commit a crime and then punishing him for it. Ibid.
 
 
 146
 3. Since, in accusatory procedure, an accused must not be under a compulsion to make statements adverse to his own interests, any such statements made under oath (even though the oath were taken voluntarily) would be open to the objection that they were compelled by fear of the sanctions for perjury. Schmidt, supra,[37] Stalder, supra. Moreover, the oath cannot be said to be taken voluntarily, since there is always the fear that failure to take it if it is available will result in an inference of guilt. Brangsch, supra; and see quotation in footnote 36, supra. In either case the result is the same: compulsion to 'make statements which the accused of his own free will would not make,' and hence interference with his 'freedom of defense'. Schmidt, supra.
 
 
 147
 4. European commentators also doubt that the statements made by an accused in his own favor, would be accorded greater weight if made under oath. Stalder, supra. 'No one can expect an accused to fight for truth and justice in his own prosecution.' Schmidt, supra. Compare statements in II Wigmore, supra, Section 579, pp. 203-204.
 
 
 148
 Many of the arguments of the proponents of statutes enabling an accused to testify in his own behalf (See II Wigmore, supra, Section 579), rested in part on the assumption that unless the accused put himself under oath he was precluded from giving evidence in his own behalf. These arguments would, it should be noted, have considerable less force against the European form of disqualification, where the accused's unsworn statements may be accorded considerable weight.
 
 
 149
 On Petitions for Rehearing or to stay issuance of mandate and to continue bail.
 
 
 150
 PER CURIAM.
 
 
 151
 Petitions for stay of mandate and continuance of bail as to each of appellants granted.
 
 
 152
 Petitions for rehearing denied.
 
 
 153
 FRANK, Circuit Judge Dissenting as to the petitions for rehearing as to all the defendants:
 
 
 154
 When we uttered our original opinion, I dissented (for reasons I then stated) solely as to the defendant Halperin. The rehearing petitions, however, have led me to reconsider our decision with regard to the statute of limitations. I now think that because of a serious error in the trial judge's charge on that issue-- printed in the Appendix to this opinion-- we should order a new trial for all the defendants.
 
 
 155
 1. When I concurred in affirmance of the conviction of the defendants other than Halperin, I understood we were holding that the three year statute barred conviction unless, after October 25, 1951 (i.e., three years before the date of indictment), one or more of the defendants committed an overt act for (a) the purpose of preventing criminal prosecution of the taxpayers for tax evasion, as distinguished from (b) the purpose of preventing prosecution of the conspirators for conspiracy.
 
 
 156
 For the opinion, in discussing the statute of limitations, made that nice distinction as follows: 'What the fixers had to sell was freedom from criminal prosecution for tax frauds. What the taxpayers bargained for was protection from a tax evasion prosecution. * * * This conspiracy is wholly unlike the ordinary illegal scheme in that the jury may well have inferred that the official announcement that there would be no criminal prosecution of the taxpayers was merely the delivery of a substantial installment of what appellants agreed to deliver for the huge sums paid. The six-year Statute of Limitations, 26 U.S.C. (1940 Ed.) § 3748, did not run in favor of the taxpayers until some time after the commission of the overt acts relied upon. In the interval there was no assurance, other than continuing efforts by Grunewald, Bolich and the others, that the whole nefarious business might not be brought to light, followed by the revocation of the decision not to criminally prosecute the taxpayers. This is a significant element in the proofs adduced by the government, as concealment of the conspiratorial acts was necessary not only to protect the conspirators from a conspiracy prosecution but also to protect the taxpayers from a tax evasion prosecution.'
 
 
 157
 Certain overt acts, intended to conceal facts from the King Committee, occurred in 1951, but more than three years prior to the indictment date.[1] There was, however, evidence of other overt acts occurring after October 1951.[2] Properly instructed by the trial judge, the jury could reasonably have inferred that these acts were done, at least in part, to prevent the taxpayers' prosecution for tax evasion; but that inference was not irresistible.
 
 
 158
 2. The trouble is that the charge, in failing to distinguish between
 
 
 159
 (1) acts of concealment intended (at least in part) to block prosecution of the taxpayers for tax evasion, and
 
 
 160
 (2) acts of concealment intended solely to block prosecution of the conspirators for conspiracy,
 
 
 161
 made it unnecessary for the jury, in order to convict the defendants, to find that 'the official announcement that there should be no criminal prosecution of the taxpayers was merely a substantial installment of what appellants agreed to deliver for the huge sums paid.'
 
 
 162
 3. All would have been well if, in addition to what the judge told the jury, the charge had contained something like the following:
 
 
 163
 'If you find that the objective of the conspiracy was achieved when, in January 1949, there was obtained the assurance of immunity of the taxpayers from prosecution for tax evasion, then you must acquit the defendants, unless you find that, before that date, the conspiracy included an actual agreement-- not merely an implied one-- to conceal the conspiracy after that date. This is so, because then the three year statute of limitations, as to the conspiracy had run in January 1952, before the indictment of the defendants.
 
 
 164
 'However, the six year statute of limitations, against prosecution of the taxpayers for tax evasion, did not run until December 31, 1952. If, then, you find that an objective of the conspiracy was to prevent prosecution of the taxpayers for tax evasion, then the three year statute of limitations, against prosecution of the defendants for conspiracy had not run in January 1952, provided you find any overt act, by any conspirator, between October 25, 1951 and December 31, 1952, committed for the purpose, at least in part, of preventing the prosecution of the taxpayers for tax evasion; but even if you find that an objective of the conspiracy was to prevent such prosecution for tax evasion, nevertheless, if you find that all such overt acts were done solely to prevent the prosecution of the conspirators, or any of them, for conspiracy, then you must acquit the defendants, unless you find that, before December 31, 1952, the scope of the conspiracy was enlarged to include such concealment of the conspiracy.'
 
 
 165
 Under the charge as given, however, it was not essential that an objective of the original conspiracy was to prevent prosecution of the taxpayers for tax evasion until the six year statute of limitations had run against such prosecution, but it sufficed under the charge if the jury found (1) that the conspiracy included an implied agreement or understanding to conceal the conspiracy for any purpose, plus (2) an overt act of concealment committed by any of the defendants at any time-- even an overt attempt by one of the defendants to save himself from prosecution.
 
 
 166
 True, the trial judge charged that such an agreement or understanding to conceal could not be 'implied' or be an 'afferthought.' But a distinction must be made between (1) an agreement to conceal an ordinary conspiracy, implied in the mere existence of that conspiracy, and (2) such an agreement to conceal which is reasonably inferred from other acts. As I shall try to show below, overt acts of concealment, without more, cannot suffice to prove that an ordinary conspiracy included an agreement to conceal.[3] And here if-- as the jury may well have found-- the conspiracy ended in 1949 (when Bolich promised the taxpayers immunity from tax evasion prosecution if they confessed and when they then confessed), the record contains no evidence, other than overt acts of concealment, reasonably warranting an inference of an agreement to conceal as part of the conspiracy. Therefore, any such agreement could only have been implied from the mere existence of the conspiracy itself; and any jury is very likely to conclude that when men enter into an illegal agreement, for which they can be prosecuted, they implicitly understand, as part of that agreement, that they will do those acts necessary to conceal their crime from the prosecuting authorities. If the charge here is sustained, then the statute of limitations in conspiracy cases could be suspended indefinitely by an act of concealment by any of the conspirators at any time, so long as the jury found that the mere existence of a conspiracy implied an agreement to conceal it.
 
 
 167
 4. This will not do, in the light of Krulewitch v. United States, 336 U.S. 440, 444, 69 S.Ct. 716, 718, 93 L.Ed. 790. There the Supreme Court held that, after the objective of a conspiracy had been achieved, the duration of that conspiracy could not be extended by the device of finding an implied subsidiary conspiracy 'aimed at preventing detection and punishment.' In the case at bar, the government concedes in its brief that the action of the defendants had estopped the United States from prosecuting the taxpayers for tax evasion after their confessions had been secured in January 1949-- pursuant to the promise of immunity secured for them by Bolich-- unless the illegal or fraudulent methods by which this promise had been obtained came to light before the six year statute had run against such prosecution. Now the jury might reasonably have found that the conspiracy was limited to creating such an estoppel in 1949, and that it did not include a continuing conspiracy to protect the taxpayers from a tax evasion prosecution throughout the six year period. Had the jury so found, it would have had to find that the conspiracy terminated in January, 1949. By allowing the jury to find a continuation of the conspiracy, even if its purpose was thus limited, provided only there was an implied agreement or understanding among the conspirators to conceal the conspiracy, the charge, I believe, runs afoul of Krulewitch. I think the Supreme Court's decision in Krulewitch may not be avoided by the device of instructing the jury that the conspiracy is continued by any act of concealment by any conspirator at any time, if only the jury finds, as part of the original conspiracy, an agreement among the conspirators, implied in the mere existence of the conspiracy, to conceal their crime from the government, even after the purpose of the conspiracy had been attained. For one of the reasons underlying the Krulewitch decision was the fear that the conspiracy doctrine could be used to postpone indefinitely the operation of the statute of limitations. See the opinion of Jackson, J. (dissenting on another point) in Lutwak v. United States, 1953, 344 U.S. 604, 622, 73 S.Ct. 481, 97 L.Ed. 593.
 
 
 168
 To be sure, in Lutwak, the Court said, not only that acts of concealment occurring after the conspiracy ended might be relevant to prove the conspiracy, but also added, in a dictum, that there might be a conspiracy which included an agreement among the conspirators to conceal the existence of the conspiracy. But this is very far from saying that overt acts of concealment, without more, suffice to prove that a conspiracy included an implied agreement to conceal the conspiracy. I think the Supreme Court did not intend, by its dictum in Lutwak, to permit its Krulewitch ruling to be circumvented by proof merely that a conspirator committed an overt act of attempted concealment in order to prevent disclosure of the conspiracy.[4] In the instant case-- absent a finding that the purpose of the conspiracy was to prevent a tax evasion prosecution of the taxpayers-- there was no evidence, except the overt acts of attempted concealment, that the conspiracy originally included an agreement to conceal the conspiracy; and I repeat, the charge did not require the jury, as essential to a conviction of the defendants to find that the conspiracy's purpose was prevention of a tax evasion prosecution.
 
 
 169
 In Lutwak, the Supreme Court observed, 344 U.S. at pages 616-617, 73 S.Ct. at pages 488, 489, that the indictment alleged concealment as part of the conspiracy, and that there was evidence that one of the defendants had made a statement indicating a purpose to conceal the conspiracy. Nevertheless, since the conspiracy's purpose had clearly been achieved before the utterance of that statement, the Court did not allow this factor to extend the duration of the conspiracy on the theory that it continued for the purpose of concealment. In Lutwak the indictment did not allege any overt act of concealment; but that seems to me an irrelevant consideration. And see Fiswick v. United States, 329 U.S. 211, 216, 67 S.Ct. 224, 227, 91 L.Ed. 196: 'Though the result of a conspiracy may be continuing, the conspiracy does not thereby become a continuing one. See United States v. Irvine (98 U.S. 450, 25 L.Ed. 193). Continuity of action to produce the unlawful result, or as stated in United States v. Kissel, supra (218 U.S. 601, 607, 31 S.Ct. 124, 54 L.Ed. 1168), 'continuous co-operation of the conspirators to keep it up' is necessary.'5. As noted above, under the charge in the instant case, the jury may well have found-- and, for all we know, did find-- that the conspiracy ended in 1949,[5] since the jury may have found that it was not a purpose of the conspiracy to prevent prosecution of the taxpayers for tax evasion after that date. It is perhaps arguable that, even if the jury found the conspiracy ended in 1949, nevertheless the evidence justified an inference by the jury that, after the end of the conspiracy in 1949, the defendants, in meetings they held, overtly agreed to conceal the conspiracy,[6] and, subsequent to October 1951, committed overt acts pursuant to that post-1949 agreement. Even so, such an overt agreement to conceal, made after 1949, could not reasonably serve to prove that the conspiracy, if it otherwise ended in 1949, had, before 1949, included an agreement-- other than by implication from the mere existence of the conspiracy-- to conceal the conspiracy after 1949. It could serve, at most, to prove a new conspiracy to conceal an older conspiracy. In that event (although such a new conspiracy would be evidence of the older conspiracy) the defendants could not, on such evidence, be convicted of the older conspiracy which ended in 1949, since the statute of limitations would have run against the older three years after 1949. See United States v. Siebricht, 2 Cir., 59 F.2d 976, 978, to the effect that an old conspiracy 'could not be revived by the breath of a new and different conspiracy * * *' The defendants were not indicted for such a new conspiracy, and the judge's charge precluded a conviction based thereon.[7] See, e.g., United States v. Siebricht, supra.
 
 
 170
 It follows that, if (1) the jury found-- as it may have-- that the conspiracy ended in 1949, it could not also reasonably have found (2) that the conspiracy included any understanding to conceal the conspiracy (in order to avoid detection and punishment for conspiracy) other than such an understanding implied in the mere fact of the conspiracy. The second of those findings would be bad, under Krulewitch. But the charge permitted the jury to render a verdict of guilty based on both such findings. I think the language in Lutwak cannot be stretched to sanction such a charge, and that therefore the charge was erroneous.
 
 
 171
 6. No matter how guilty the defendants may have been, they could not be convicted validly, if the statute had run against their crime before the indictment. Consequently, the harmless error doctrine (assuming, arguendo, it would otherwise apply) cannot insulate the conviction from the judge's error in his charge, and the defendants, I think, should be granted a new trial.
 
 APPENDIX
 
 172
 The judge's charge, as to the statute of limitations, reads as follows:
 
 
 173
 'You will recall that the indictment states, among other things, that it was part of the conspiracy that the defendants and co-conspirators would make continuing efforts to avoid detection and prosecution by any governmental body, executive, legislative, and judicial, of tax frauds perpetrated by the defendants and co-conspirators through the use of any means whatsoever including but not limited to * * * the influencing, intimidating, and impeding of prospective witnesses to refrain from disclosing the true facts.
 
 
 174
 'In other words, the indictment alleges that the conspiracy comprehended within it a conspiracy to conceal the true facts from investigation, should investigation thereafter eventuate. This is an important element of the first count of the indictment which you must take into consideration, inasmuch as the Statute of limitations on the charge of criminal conspiracy is three years and unless the conspiracy was continuing to a period within three years prior to the date of the indictment, October 25, 1954, and some overt act was performed within that three-year period, the crime, if any alleged in the first count of the indictment would be outlawed. It is the contention of the government that the conspiracy did not end when the taxpayers were advised that there would be no criminal prosecution recommended by the Special Agent's office, but that an integral part of the entire conspiracy was an agreement to conceal the acts of the conspirators and that when thereafter an investigation was started by Congress and by the Grand Jury in the Eastern District of New York, the conspirators performed overt acts in pursuance of the original conspiracy designed to conceal the true facts; and that these acts occurred within three years prior to the date of the indictment. On this issue, it will be necessary for you to determine whether, beyond a reasonable doubt, you can conclude that the conspiracy was of the nature described in the first count of the indictment and comprehended an agreement to conceal and whether some overt act took place in the period of three years prior to October 25, 1954 to carry out such purpose of the conspiracy * * *.
 
 
 175
 'Were these overt acts in pursuance of the conspiracy? An overt act is defined, as a matter of law, as any act done to effect the object of the conspiracy. To be an overt act, it must be in furtherance of the object of the conspiracy, although standing by itself, it need not be a criminal act. The Statute of Limitations does not begin to run on a conspiracy indictment until after the last overt act done by a co-conspirator to carry out an objective of a continuing conspiracy.
 
 
 176
 'To determine whether certain of the alleged overt acts were in furtherance of the object of the conspiracy, you have to determine the duration of the conspiracy. Did it end when the Pattullo Modes people and the Gotham Beef people received an assurance of no prosecution from the Bureau of Internal Revenue, or was a part of the conspiracy a continuing agreement to conceal the acts done pursuant thereto? In determining whether a part of the conspiracy was an agreement to continue to conceal the illegal acts after their consummation, you may not imply that such an agreement was part of the conspiracy. You would have to find from the evidence of the acts and declarations of the co-conspirators that there was an understanding or agreement to conceal the conspiracy. If you find that such an agreement or understanding to conceal the conspiracy was not a part of the conspiracy to defraud the government, but no more than an afterthought brought to the surface when the co-conspirators were confronted with the Grand Jury and King Committee investigations, then you must find, as a matter of law, that the defendants are not guilty of the crime charged in the first count of the indictment. If you find that the evidence shows, beyond a reasonable doubt, that as a part of the conspiracy to defraud the government, there was an agreement or understanding to conceal the illegal acts and that this too was an objective or part of the conspiracy, then you may find that such understanding was a part of the conspiracy. However, you must additionally determine whether this objective of the conspiracy was known to the defendants. If this objective was known originally by only part of the conspirators but thereafter during the existence of the conspiracy, the scope of the conspiracy was extended so as to include such an agreement to conceal, and if you find that some of the defendants did not know of the expansion to include the agreement to conceal, you may not impute to them the knowledge of their co-conspirators and they could not be found guilty of the crime charged in Count one.
 
 
 177
 'Now, therefore, as to the defendants Halperin, Grunewald, and Bolich, you have the questions of fact, first, as to whether they became parties to a conspiracy to defraud the United States, and that part of this conspiracy was to make continuing efforts to avoid detection and prosecution by any governmental body; second, whether they knew the general objectives of the conspiracy; and third, whether any one of the conspirators took any overt act within three years prior to October 25, 1954 to accomplish the result of that conspiracy. It you can answer these questions all in the affirmative, beyond a reasonable doubt, then you would be justified in returning a verdict of guilty on the first count of the indictment as against each one of these three defendants. If you cannot find that you can answer these questions in the affirmative, beyond a reasonable doubt, as to these three defendants, then as to the one concerning whom you cannot so answer it, you should return a verdict of not guilty.'
 
 
 
 [1]
 The court's charge on this point was as follows:
 During the cross examination of one of the defendants, the government questioned the defendant as to his previous statements before the Brooklyn Grand Jury in which he refused to answer certain questions on the ground that answers to them might tend to incriminate him. These questions related to matters similar to those to which the defendant testified at this trial when he took the stand. No witness is required to take the stand or required to give testimony that might tend to incriminate him; but when a defendant takes the stand in his own defense at a trial, it is proper to interrogate him as to previous statements which he may have made under oath concerning the same matter, including his assertion of his constitutional privilege to refuse to testify as to those matters before a grand jury. You may use this evidence of a defendant's prior assertions of the Fifth Amendment for the sole purpose of ascertaining the weight you choose to give to his present testimony with respect to the same matters upon which he previously invoked his privilege.
 The defendant had the right of asserting the Fifth Amendment when he appeared before the Grand Jury, and I charge you that you are not to draw any inference whatsoever as to the guilt or innocence of the defendant in this case by reason of the fact that he chose to assert his unquestioned right to invoke the Fifth Amendment on that previous occasion. However, it was proper for the Government to question the defendant with respect to his previous invocation of the Fifth Amendment, but you may consider this evidence of his prior assertions of the Fifth Amendment only for the purpose of ascertaining the weight you choose to give to his present testimony with respect to the same matters upon which he previously asserted his constitutional privilege. It is not to be considered in a determination of the guilt or innocence of any co-defendant.
 
 
 [1]
 Not the grand jury which indicted him
 
 
 [2]
 The Court said: 'There can be no basis, then, for excluding the testimony objected to, unless it be on the theory that, under the peculiar circumstances of the case, the defendant's immunity should be held to survive his appearance as a witness on the second trial, to the extent, at least, that he may be permitted to preserve silence as to his conduct on the first. Whether there should be such a qualification of the rule that the accused waives his privilege completely by becoming a witness must necessarily depend upon the reasons underlying the policy of the immunity, and one's view as to whether it should be extended. The only suggested basis for such a qualification is that the adoption of the rule contended for by the government might operate to bring pressure on the accused to take the stand on the first trial, for fear of the consequences of his silence in the event of a second trial, and might influence the defendant to continue his silence on the second trial, because his first silence may there be made to count against him. * * * We need not close our eyes to the fact that every person accused of crime is under some pressure to testify, lest the jury, despite carefully framed instructions, draw an unfavorable inference from his silence. See State v. Bartlett, 55 Me. 200, 219; State v. Cleaves, 59 Me. 298, 300. When he does take the stand, he is under the same pressure: To testify fully, rather than avail himself of a partial immunity. And the accused at the second trial may well doubt whether the advantage lies with partial silence or with complete silence. Even if, on his first trial, he were to weigh the consequences of his failure to testify then, in the light of what might occur on a second trial, it would require delicate balances to enable him to say that the rule of partial immunity would make his burden less onerous than the rule that he may remain silent, or, at his option, testify fully, explaining his previous silence. We are unable to see that the rule that if he testifies, he must testify fully, adds in any substantial manner to the inescapable embarrassment which the accused must experience in determining whether he shall testify or not.' 271 U.S. at pages 498-499, 46 S.Ct. at page 568
 
 
 [3]
 21 Ill.L.Rev. (1926) 396, 400
 
 
 [4]
 Brown, 40 Am.Bar. Ass'n J. (1954) 404, 406
 
 
 [5]
 After so stating, the court held that Johnson had deliberately waived the error
 
 
 [6]
 Cf. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406
 
 
 [7]
 See Judge Learned Hand, dissenting in United States v. Remington, 2 Cir., 208 F.2d 567, 571, at pages 572-573
 
 
 [8]
 Ibid
 
 
 [9]
 See, e.g., 8 Wigmore, Evidence (3d ed.) Section 2250; United States v. St. Pierre, 2 Cir., 132 F.2d 837, 840, 147 A.L.R. 240, dissenting opinion; Morgan, The Privilege against Self-Incrimination, 34 Minn.L.Rev. (1949) 1. Coke called the oath ex officio an invention of the devil; see 12 Co. 26, 77 Eng.Rep. 1308
 
 
 [10]
 In United States v. Scully, 2 Cir., 225 F.2d 113, I suggested that, were it not for Wilson v. United States, 162 U.S. 613, 623-624, 16 S.Ct. 895, 40 L.D. 1090 and Powers v. United States, 223 U.S. 303, 313-314, 32 S.Ct. 281, 56 L.Ed. 448, I would hold that every witness before a grand jury should be advised of his privilege. When I so wrote, I could perceive no new doctrinal trend in the Supreme Court decisions contrary to the Wilson and Powers decisions. But, as shown infra, such a trend has since developed
 
 
 [11]
 See also concurring opinion in United States v. Gonzales Castro, 2 Cir., 228 F.2d 807, 808, at page 810
 
 
 [12]
 See Powell v. United States, 96 U.S.App.D.C. 367, 226 F.2d 269, 276: 'The scope and meaning of the Self-Incrimination Clause have been restated emphatically * * * in the opinion of Chief Justice Warren in Quinn v. United States.'
 
 
 [13]
 In Raffel, the Court skirted this question. See also Bruno v. United States, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257
 
 
 [14]
 Maury, Validity of Statutes Authorizing the Accused to Testify, 14 Am.L.Rev. (1880) 753, quoted in part in point I of the Appendix to this opinion
 
 
 [15]
 See, e.g., Stephen, Prisoners On Oath (1898) and Johnston, Evidence of Accused Persons, 4 D.L.R. (1931), quoted in part in point I of the Appendix to this opinion
 In the states of this country, except by statute in Pennsylvania, and in the federal courts as the decisions now stand, if the accused elects to become a witness, the prosecutor, on cross-examination, may bring out the fact that the defendant had been previously convicted. Virtually all experienced lawyers and judges acknowledge that, almost invariably, the jury will treat such evidence as evidence of the defendant's guilt of the crime for which he is on trial, despite the judge's instruction that they must consider it as bearing on the defendant's credibility only. On that account, usually the lawyer for an accused with a criminal record will advise him not to testify. Yet his failure to do so is likely to convince the jury of his guilt. Either way he is likely to be convicted.
 The English and Pennsylvania statutes provide that the prosecutor may not ask the accused who testifies concerning any previous conviction except in certain restricted specified circumstances. See 1 Wigmore, Evidence (3d ed.) Section 194a; and note Uniform Rules of Evidence (1953) Rule 21.
 The Supreme Court, without a statute, could, I think, adopt that rule. I hope it soon will.
 
 
 [16]
 See, Solicitors' J., March 9, 1901, 1930, quoted in Best, Evidence (12th ed., 1922) 542; cf. 2 Wigmore, Evidence (3d ed.) p. 425
 
 
 [17]
 See also 1 Am.L.Rev. (1867) 443, 446, 448
 Cf. Judge Learned Hand's comment, dissenting in United States v. Remington, 2 Cir., 208 F.2d 567, 571, at page 575 on 'the repugnance (of) decent people' at punishing a man for perjury which officials or their agents have 'incited' or 'instigated' him to commit.
 
 
 [18]
 See, e.g., April, A Reappraisal of the Immunity From Self-Incrimination, 39 Minn.L.Rev. (1954) 75
 
 
 [19]
 See, e.g., Usher, The Rise and Fall of the High Commission (1913); Frank, If Men Were Angels (1942) 240-250; United States v. St. Pierre, 2 Cir., 132 F.2d 837, 840, 147 A.L.R. 240, dissenting opinion; Pittman, The Colonial and Constitutional History of The Privilege Against Self-Incrimination In America, 21 Va.L.Rev. (1935) 763
 
 
 [20]
 See Boyd v. United States, 116 U.S. 616, 624-625, 6 S.Ct. 524, 29 L.Ed. 746. There the Court noted that similar experiences led to the unreasonable search-and-seizure prohibition of the Fourth Amendment and the Self-Incrimination prohibition in the Fifth
 
 
 [21]
 See Miller, Origins of the American Revolution (1943) 325, 340. The Tea Act of 1773-- of which the smugglers were the first victims-- led to the Boston Tea Party which was hailed as a 'glorious illegality' based on 'the great law of nature and reason' which gives every society 'a right to defend itself from ruin.' Ibid. 338, 349
 See also, ibid. 84: 'A New Englander, it was said (in 1775), derived his right of cheating the revenue, and of perjuring himself, from the example of his fathers and the rights of nature.'
 See, too, Lasson, the Fourth Amendment to the Constitution (1937) 51-52. At 72, he says: 'In 1768, a riot resulted when John Hancock's sloop, 'Liberty,' was seized under a writ for landing Madeira wines without payment of duties.'
 See, too, Quincy's Mass.Reports (1865) 456ff; Hancock was arrested. At the trial, he objected to being tried in an admiralty court according to civil law rules of evidence and not according to common law rules with witnesses appearing in open court for examination; he asserted it as a right that 'witnesses not presumptions * * * are to be the evidence.'
 See also Pittman, loc. cit., 783ff; McClellan, Smuggling In the American Colonies (1912) 89.
 
 
 [22]
 Frank, Book Rev., 25 Ind.L.J. (1950) 231, 232-233
 
 
 [23]
 Frank, Fate and Freedom (1945) 284-288
 
 
 [24]
 Murray, Five Stages of the Greek Religion (1925) 236
 
 
 [25]
 Holmes, The Common Law (1881) 37
 
 
 [26]
 Note also, e.g., the history of the client's privilege; 9 Holdsworth, History of English Law (1926) 201-202; 8 Wigmore, Evidence (3d ed.) Sections 2290-2291
 
 
 [27]
 Bentham protested with equal vigor against this privilege. See his Rationale of Judicial Evidence, b IX, pt. IV, Ch. 5
 
 
 [28]
 Of course, 'procedural' or 'adjective law' cannot be kept separate from 'substantive law'; the two intertwine and influence one another (as 'means' and 'ends' usually do). The attempt sharply to differentiate them 'prevents lawyers from following up enthusiastically the implications of a 'judicial process"; Frank, Some Tame Reflections on Some Wild Facts, in Vision and Action (Ratner ed. 1953) 56, 79-80. See also In re Fried, 2 Cir., 161 F.2d 453, 463-464, 1 A.L.R.2d 996; Frank, Courts on Trial (1949) 103-107; Silving, Testing of the Unconscious in Criminal Cases, 69 Harv.L.Rev. (1956) 683, 699-701
 
 
 [29]
 See Fortas, The Fifth Amendment, 25 Cleveland Bar Ass'n J. (1954) 92
 See also note, 55 Col.L.Rev. (1955) 527 at 542: 'Traditionally Anglo-American law values the individual's life and freedom so highly that the interest of the state in discovering and punishing wrongdoers is subordinated to the right of the accused to remain a passive spectator in the judicial search for the fact of his wrong-doing.'
 
 
 [30]
 See Hall, Police and Law In a Democratic Society, 28 Ind.L.J. (1953) 133, 141; cf. 146, 162
 
 
 [31]
 Cf. Brock v. United States, 5 Cir., 223 F.2d 681, 684-685
 See Beutel, 41 Am.Bar Ass'n J. (1955) 490: 'We may well rue the day that prominent members of the Bar supported the proposition that there are 'moral' and 'immoral' constitutional provisions.'
 
 
 [32]
 Criminal Evidence Act, 61 and 62, Vict. C36 Section 1(e)
 
 
 *
 Point II of the Appendix, which necessarily involves the use of materials in foreign languages with which the writer of this opinion is not conversant, was prepared by Mr. Walter E. Shuttleworth, a member of the Third Year Class at Yale Law School and my Law Clerk for the October, 1956 term. 'Europe' or 'European,' when used in this part of the Appendix, does not include Great Britain
 See, also, Meyer, German Criminal Procedure, 41 Am.Bar Assn.J. (1955) 592 at 666-667; Pekelis, Law and Social Action (1950) 59; Rebecca West, Train of Powder (1955) 241-242.
 
 
 [33]
 Thus, as to an accused under our system, most enabling acts are construed to have abolished the right to make an unsworn statement. E.g., Rex v. McNab, 1 D.L.R. 583, 578 C.A.B.C.1945 (Canada Criminal Evidence Act so construed). The English Criminal Evidence Act of 1898 specifically preserves the right of an accused to make unsworn statements, however. See Reg. v. Pope, 18 T.L.R. 717 (1902). The same appears to be true of the Dominions other than Canada. See Cowen and Carter, Essays on the Law of Evidence (1956) 205-218
 
 
 [34]
 In England and in those British Dominons where the right to make an unsworn statement survives the statute permitting an accused to take the oath, there is some authority for regarding the unsworn statement as 'something less than evidence and something more than mere argument.' Rex v. McKenna, 44 St.R.Qd. 299, 307 (1951). And see Cowen and Carter, Essays on the Law of Evidence (1956) 205-218, urging that the jury be so charged as to statements of the accused not made under oath
 
 
 [35]
 Thus in Norway not only do the statutory provisions make wide exceptions to the rule against compulsory testimony where, because of a confidential relationship or strong personal interest, the witness would be reluctant to testify; but the courts also frequently refrain from compelling testimony where the witness asserts a strong aversion to testifying even though his case does not fit within the statutory exceptions. See Stang, Rettergangsmaaten i straffesaker (1951) 138-139, 141-142 and cases there cited. See also 1 Salomonsen, Straffeprocesslov (1925) 183-194
 
 
 [36]
 The 1950 code (StrPO) of criminal procedure, Section 136(a) extended the disqualification from oath-taking by an accused to prevent indirect pressure toward self-incrimination by prohibiting the use of drugs or lie detectors irrespective of the waiver of an accused. 'If the accused declined to submit to application of the apparatus-- assuming its reliability-- the inference that he did not want to tell the truth would be inescapable. If he wanted to avoid that inference * * * the use of the apparatus would constitute a compulsion to make statements other than those he would decide to make of his own free will: compulsory self-incrimination.' Schmidt, op. cit. supra at 60
 The Bonn Supreme Court has held that use of a lie detector, though with the consent of the accused, to obtain a conviction violates Art. I Section I of the Constitution and a statutory prescription; see Silving, 69 Harv.L.Rev. 683, 688-689 (1956).
 Since the same reasoning used to deny waiver of the right to refuse to incriminate oneself by lie detector is also used to prevent an accused from taking the oath (and see (C), infra) it is possible that an enabling act allowing the accused to testify as a witness might be held unconstitutional in Germany.
 
 
 [37]
 Where supra appears without page number, the pages in the immediately preceding citation of the same author are designated
 
 
 [1]
 E.g., in the summer of 1951, Davis and Halperin called in Marx and Mrs. Segel, the Pattullo taxpayers, and told them not to talk to anyone about the case
 
 
 [2]
 Testimony at the trial revealed the following acts which might be said to have been done with the purpose of concealment:
 (a) In the summer of 1950, Bolich borrowed the records of his occupancy for the entire year from the Washington Hotel. In December 1951, when the King Committee subpoenaed these records, the hotel management asked Bolich to return them. He denied receiving them.
 (b) Sometime after the Grand Jury was empaneled in February 1952, inquiries were made by a revenue agent concerning a $500 check made out to Deutsch by Smith. Schopick induced Smith to lie and say that the check was a loan made to Deutsch by his brother-in-law, Hoffman.
 (c) In late 1951 or early 1952, Davis and Halperin saw Tobias to reassure him that no one had talked about the Gotham case and that if everyone was silent, the whole thing would blow over.
 (d) In May, 1952, Nancy Hain, Grunewald's private secretary, was subpoenaed by the Grand Jury. Grunewald immediately phoned her and offered to furnish her money for a trip to New York, which he did. He advised that she need not tell the Grand Jury anything about his personal business and that she should say that she didn't remember.
 (e) In March 1952, Halperin, Davis, Schopick and Hoffman met and decided that the Pattullo taxpayers should be persuaded to continue withholding information from the investigators. Davis met with Marx and was told by him that the Pattullo people had decided to cooperate with the Government. Davis said to Marx that he '* * * would be crazy to talk,' and implored him '* * * Morton, are you going to turn me in?' Davis also saw Mrs. Segel and urged her to lie before the Grand Jury.
 (f) Halperin and Davis saw Tobias again in February, 1952 and told him that the Pattullo investigation was being continued and that if anyone came to speak with him or Berman, they should be referred to Davis as Berman's attorney. Halperin said that he had done Berman a good turn in handling his tax case and did not want Berman to hurt Halperin by now talking in connection with the tax case.
 (g) In March 1952, Davis saw Tobias again and advised him that the Pattullo People had gone to the Grand Jury and told them that he and Halperin had handled the tax case. He was afraid that the Gotham case would also be investigated and he asked Berman and Tobias not to say anything.
 Some of these acts-- e.g., (e) and perhaps (f) and (g)-- were motivated solely by defendants' concern for themselves, rather than by a desire to protect the taxpayers. And, although the jury could reasonably find that the other acts, or some of them, were done, at least in part, to prevent the taxpayers' prosecution for tax evasion, such a finding was not inevitably compelled by the evidence: The jury could reasonably have found the sole purpose of these acts was to protect defendants. They were entitled to a charge which stated the issue clearly and precisely.
 
 
 [3]
 See point 4, infra
 
 
 [4]
 In Lutwak the Court's dictum did not relate to the statute of limitations but to the admissibility of evidence
 
 
 [5]
 For the jury may well have found that the conspiracy's purpose had been accomplished in 1949 when, pursuant to Bolich's promise, the taxpayers confessed
 
 
 [6]
 I refer to evidence that, after 1949, the defendants, or some of them, met and planned to prevent the taxpayers from revealing the truth
 
 
 [7]
 He charged that the jury could consider whether 'the scope of the conspiracy was extended' to include an agreement to conceal, if this extension occurred 'during the existence of the conspiracy.'